**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD**

**BRANDON FLACK,**

      **Petitioner,**

**v.**                               **Case No. 1:17-cv-04381**

**DONNIE AMES, Superintendent,
Mount Olive Correctional Complex,[1]**

      **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable David A. Faber, Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court are Petitioner's Petition for a Writ of Habeas Corpus (ECF No. 2), Petitioner's Motion for Summary Judgment (ECF No. 12), Respondent's Motion for Summary Judgment (ECF No. 13), and Petitioner's Motion for Stay and Abeyance (ECF No. 17).

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

---

[1]  The petitioner is now incarcerated at the Mount Olive Correctional Complex, where the current Superintendent is Donnie Ames.  The Clerk is directed to substitute Donnie Ames as the proper respondent herein.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Section 2254 of Title 28 provides, in pertinent part:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that -

Case 1:17-cv-04381     Document 27     Filed 08/15/19     Page 3 of 68 PageID #: 1341

(A) the applicant has exhausted the remedies available in the courts of the State . . . .

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. §§ 2254(b)(1)(A), (c).  The petitioner bears the burden of proving exhaustion. *See Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998); *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997).  Where a petitioner has failed to exhaust his state court remedies, generally, the federal petition should be dismissed.  *McDaniel v. Holland*, 631 F. Supp. 1544, 1545 (S.D. W. Va. 1986) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 477 (1973)).

In West Virginia, prisoners may exhaust their available state court remedies either by stating cognizable federal constitutional claims in a direct appeal, or by stating such claims in a petition for a writ of habeas corpus in a state circuit court pursuant to West Virginia Code § 53-4A-1, followed by filing a petition for appeal from an adverse ruling in the SCAWV.  *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D. W. Va. 1995); *McDaniel v. Holland*, 631 F. Supp. at 1545.  A prisoner may also exhaust the state court remedies by filing a petition for a writ of habeas corpus filed under the original jurisdiction of the SCAWV.  However, an original jurisdiction petition that is denied without an indication that the denial is with prejudice following a determination on the merits will not exhaust the prisoner's state court remedies.  *See Moore*, 879 F. Supp. at 593; *McDaniel,* 631 F. Supp. at 1546; *see also, Meadows v. Legursky*, 904 F.2d 903, 908-909 (4th Cir. 1990) (*abrogated on other grounds, Trest v. Cain*, 522 U.S. 87 (1997)).

The AEDPA also established a one-year statute of limitations for filing a section 2254 petition, which runs from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or law of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) further provides:

The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

## **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are derived from Petitioner's trial transcripts and other exhibits attached to Respondent's Motion for Summary Judgment, including the opinions of the state courts denying Petitioner's direct appeal and habeas corpus petitions.  On January 28, 2011, Brandon Flack (hereinafter "Brandon" or "Petitioner") and several others drove from Pulaski, Virginia, to Bluefield, West Virginia.  Shortly after midnight, Brandon and three other men went to a home in Bluefield owned by Brandon's uncle, David Flack ("David").

It is undisputed that three of the men entered the house and a struggle ensued between Brandon and his cousin, Matthew Flack ("Matthew"), during which both men suffered gunshot wounds.  Matthew died from his wounds.  Brandon and the other men immediately left the house and drove Brandon to the hospital for treatment of his wounds.

While at the hospital, Brandon and the other men falsely told the police that Brandon had been shot in a drive-by shooting elsewhere in Bluefield. A search of the vehicle they were traveling in revealed two handguns and ski masks in the trunk.

The State's theory of the case was that the men conspired to burglarize David's residence and rob its occupants. According to the State's evidence, when they arrived at the house, Brandon, Jasman Montgomery ("Jasman"), and Jacob Thomas ("Jacob") donned ski masks and went to the back door of the house. The fourth man, Joseph Flack ("Joseph"), who is blind, remained in the car.

Matthew, who was playing a video game with Milton ("Mel") Thomas, heard a knock, got up, and went to the back door, but when he saw the men, he retreated upstairs and retrieved a gun. At that point, the men allegedly kicked in the door and entered the home, causing Mel to also run upstairs and into the bathroom. India Simmons ("India") and another minor female remained in the living room. Brandon met Matthew on a landing of the staircase, where they engaged in a struggle. Matthew allegedly fired his gun, injuring Brandon. The State contended that Jasman then fired a shot that killed Matthew.

### *Jasman Montgomery's testimony*

By the time of Petitioner's trial, Jasman had pled guilty to first degree murder, had received a life with mercy sentence, and agreed to testify for the State. Jasman testified that he had previously made a plan with Brandon and Jacob to "go somewhere to pop a trunk" and steal money they believed would be in the trunk. (ECF No. 13, Ex. 1 at 181). Thus, on January 28, 2011, he drove up to Bluefield with Brandon, Jacob, Heather Davis (his ex-girlfriend), and Ashley Burelson (Jacob's girlfriend). They traveled in Heather's grandfather's red Mercury. (*Id.* at 182-183, 185).

However, when they arrived in Bluefield, they went to Joe Flack's house and learned that the car they intended to break into was not there. Jasman further testified that, at that point, they made a new plan to go to David Flack's house "to go to rob." (*Id.* at 183-184, 190). Thus, he, Brandon, Jacob and Joe went over to David's house in Heather's grandfather's car, and they parked in the alley. Jasman confirmed that he, Brandon, and Jacob were wearing toboggans. (*Id.* at 185-186).

Jasman stated that they knocked on the door and Matthew came to the door, looked out, but then he left. He further stated that either Brandon or Jacob kicked in the door while he had his back turned. He further stated that he and Jacob had guns. (*Id.* at 186-187). Jasman further testified that, after he entered the house, he heard a gunshot and heard Brandon yell, "I'm hit," so he ran up the stairs, pulled out a .9mm Hi Point pistol, and fired it. (*Id.* at 187-188). He further stated that he saw Brandon and Matthew wrestling on the floor (with Matthew on top) but, after he fired the gun, he ran back down the steps, and was unaware that Matthew had been shot. (*Id.* at 188-189). He further stated that, after they left the house to go to the hospital, the masks they had been wearing and the guns were put in the trunk of the car. (*Id.* at 189-190). He further confirmed that they were not invited into the house. (*Id.* at 190).

### Mel Thomas's testimony

Mel testified that, while he and Matthew were playing a video game, there was a knock at the door and Matthew went to see who it was. Matthew then came back through the living room and said "There's guys out there with masks on" as he went upstairs. Then they heard a "boom" and Mel ran upstairs as well. He figured that the "boom" was the door being kicked in or somehow forced open. Mel further testified that, as he went up

the stairs, Matthew passed him with a gun in his hand.  (ECF No. 13, Ex. 1 at 49-51, 59-61, 63).

Mel stated that he went into the bathroom, but came back out to try to help Matthew and saw him tussling or wrestling with somebody else.  However, when he heard gunshots, he went back into the bathroom and escaped out the window onto a roof.  Mel testified that he heard three gunshots.  He further stated that, while he was on the roof, he saw the men run away from the house.  At that point, he jumped off the roof and ran up the alley and attempted to call the police.  (*Id.* at 51-54).

On cross-examination, Mel testified that he was Matthew's best friend, and had previously seen Brandon at Matthew's house, including a few days before this incident. He was not aware of any animosity between Brandon and Matthew.  (*Id.* at 55-56).  Mel was further cross-examined about the statement he made to the police, in which he told them that Matthew said there were some people out back with their backs turned to the door and he didn't know them.  Thus, Mel's statement to the police did not say anything about the men wearing masks, and he admitted that he did see any masks or their faces. (*Id.* at 64-65, 70-71).

### *India Simmons' testimony*

India Simmons, who also lived in the house, testified that when they heard the knock on the door, she was on the computer.  She said that Matthew went to the back to see who it was and then came rushing back through and he mumbled something that she could not hear.  Then he ran upstairs.  She further testified that there was a loud bang at the back and three people rushed in and two of them went upstairs, and one stayed downstairs.  She said that she saw two black masks and one red mask.  A heavy-set man

was wearing a jacket with colorful logos and the other two had on "hoodies or something." (ECF No. 13, Ex. 1 at 91-93).

India confirmed that, when they heard the loud bang, Mel immediately ran upstairs. She again stated that two of the men who entered the house also ran upstairs, while the third man stayed downstairs and watched her and the other minor female, who was still asleep on the couch. India testified that she heard two gunshots, and then the two men ran back downstairs and they all left. She stated that she did not hear any of them said anything while they were there, except somebody told her to stay on the couch. After the men left, she called the police and ran upstairs with the phone and saw Matthew laying on the ground "halfway in his room and halfway into my room, and blood everywhere." (*Id.* at 94-95).

On cross-examination India further stated that the back door to the house would close, but the lock was not secure, and that the noise she heard sounded like they kicked the door in. She also confirmed that she knew Brandon and that he had come to the house "every now and then." (*Id.* at 98, 101).

### *Amanda Shorter's testimony*

Amanda Shorter ("Shorter"), a woman who was staying in a nearby house, also testified for the prosecution. Shorter stated that she had just let her dog back into the house and had laid down in the room where she was staying when she heard people loudly talking across the alley at the Bluefield Union Mission. She further stated that she saw four dark-skinned men outside a red car putting on hoodies or jackets and toboggans (one which looked like it was red and another that looked yellow). The man wearing the yellow hat looked like he had it pulled "all the way down." Then she saw the men walk up to the back door of David's house and the door opened and they all went inside. She did not see

the door kicked open and did not hear any loud noise like the door was kicked in. (ECF No. 13, Ex. 1 at 29-32, 37, 42).

Shorter further testified that she heard two gunshots in rapid succession. (*Id.* at 32, 39). Then she saw a man come out of a window and slide off the roof and the other men came back out the door they had entered. One of the men ran up the alley, while the others returned across the alley to the red car. (*Id.* at 33, 39). Shorter further testified that two girls, one blonde and one with dark hair, also got into the car before they drove off, and that she heard one of the girls say "Come on, let's go" to the other girl. (*Id.* at 33).

### *James Kaplan's testimony*

The State also presented the testimony of Dr. James Kaplan, the State Medical Examiner, who simply testified that Matthew's death was a homicide resulting from a gunshot wound inflicted by someone else. However, Dr. Kaplan did not perform Matthew's autopsy and did not author the autopsy report. Defense counsel did not object to Kaplan's testimony, and their cross-examination of his was limited to drawing out his opinion that there was no evidence that Matthew's wounds resulted from a close range shot. (ECF No. 13, Ex. 1 at 76-89).

### *Other testimony offered by the prosection*

The State further presented the testimony of Officers R.S. Gibson and R.D. Davis, who investigated the crime scene and the car driven by Petitioner and his accomplices on the night of the crime; Lieutenant Scott Myers, the lead investigating officer; Officer John Witt, who assisted in processing the evidence found at the crime scene and in the car; Lt. Roger Reed, section head of the forensic firearm and tool mark section of the West Virginia State Police Forensic Laboratory, who examined the firearms collected from the crime scene and the car; Koren Powers, section supervisor of the trace evidence section

at the West Virginia State Police Forensic Laboratory, who examined all of the evidence submitted from the crime scene for gunshot residue; Mary Heaton, a DNA analyst at the West Virginia State Police Forensic Laboratory, who confirmed that Petitioner's DNA was found on one of the ski masks found in the car; and Dr. Byron Smith, the emergency room physician who treated Petitioner for his gunshot wounds.  (ECF No. 13, Ex. 1, *passim*).

### *Brandon Flack's testimony and other testimony offered by the defense*

Brandon Flack elected to testify at trial.  He denied that they went to David Flack's house to rob anyone or to commit any crime that night.  He further stated that Matthew was his cousin, that they were friends, and that he visited there frequently, including the week before this incident.  (ECF No. 13, Ex. 1 at 290-291).  He denied that there was anything to steal from that house.  (*Id.* at 291).  Brandon further stated that he initially came to Bluefield that night to visit with his grandfather, Joseph Flack, Sr., but he was asleep.  Thus, they went to his Uncle Joe's apartment instead and were just "hanging out." (*Id.* at 292-293).

At some point, the group wanted some beer, but did not have identification ("ID") to buy it, so Brandon, Jasman, Jacob, and Joe decided to go to Joy Mart, where they thought they could buy beer without ID.  Joy Mart was near David's house, and they saw the light was on there, so they pulled up towards the house, but about 40 yards away. Brandon stated they parked down the alley rather than right behind the house because there was heavy snow on the ground.  (*Id.* at 294-296, 307-308).

Brandon further stated that he was wearing the red toboggan that was recovered from the car that night, but did not have it pulled down over his face.  He stated that his DNA was found on the mask because he had previously worn it pulled down on his face

when he was hunting with his stepfather.  (*Id.* at 296-297).    He further stated that Joe stayed in the car because he was on the phone arguing with his girlfriend.  (*Id.* at 297).

Brandon further testified that he went up to the house and knocked on the door, and Matthew came to the door and said "Who is it?" and he said, "It's Brandon."  At that time, Jacob and Jasman came up the steps, and Matthew turned away from the door. Brandon couldn't hear what he said, but thought he might have said, "Come in," so he went on in.  He stated that the Matthew left the door open.  (*Id.* at 297, 311).

Brandon further testified that he saw Matthew go upstairs, so he followed him "to see what he was up to." (*Id.* at 297-298).  However, he then saw Matthew on the landing with a gun in his hand and he heard him say something about "Bruce."  (*Id.* at 298). Brandon stated that Bruce was another uncle who had previously robbed David at his house.  (*Id.* at 298-299).  Thus, Brandon tried to explain to Matthew that Bruce was not there and that the other men were his friends.  He further stated that he believed maybe Matthew thought Jasman was Bruce "because they favor a little bit."  (*Id.* at 299). Brandon said he tried to grab Matthew's hand to get him to move the gun and that is when Brandon got shot in the leg.  (*Id.*)

Brandon further stated that he fell backwards, but continued to wrestle with Matthew in an attempt to get the gun out of his hand.  He said it was dark and he could not see because Matthew was on top of him, but he heard someone coming up the stairs. Then, he was shot again in his wrist, and he heard Matthew say "Ah," as he rolled off of him.  (*Id.* at 300-301).  Brandon then got up and ran downstairs and out the back door to go to the hospital.  (*Id.* at 301).  He claims that, at first, he lied about how he got shot because he did not want to get Matthew in trouble.  (*Id.* at 302).

Brandon again denied that they went to the house to rob David or Matthew, or to commit any crimes in the house. (*Id.* at 302-303). He further denied that anyone was wearing a mask and he does not know why India Simmons did not know who he was. (*Id.* at 303-304). Brandon was questioned about the age difference between Bruce Flack (who was in his 50s) and Jasman Montgomery (who was 21). (*Id.* at 304-305). Brandon denied seeing Mel Thomas or India Simmons' younger sister (who was asleep on the couch) that night, but confirmed that India was on the couch. (*Id.* at 306-307).

The defense also offered the testimony of Brandon's mother, Pearl Dunford. She stated that, when they were at the hospital, Brandon was not aware that Matthew had been killed, but Officer Davis had informed her that Matthew had died. When she told Brandon that Matthew was dead, he admitted that Matthew had shot him. (*Id.* at 285-288).

On April 26, 2012, following a three-day trial, a jury convicted Petitioner of first degree murder, burglary, robbery, and conspiracy, and recommended mercy on the murder charge. Petitioner then moved for a new trial, asserting that his rights were violated when the trial court failed to give a limiting instruction regarding Jasman Montgomery's testimony about his guilty plea. Petitioner also argued that his constitutional rights were violated because there were no African American members on his jury panel. *Flack v. Ballard*, 803 S.E.2d 536, 571-72 (W. Va. 2017).

### *Petitioner's Motion for New Trial*

On June 7, 2012, the trial court denied Petitioner's motion for a new trial. *Id.* Because the State had pursued the murder charge based on a felony murder theory, the trial court merged the counts of first degree murder and burglary, resulting in the dismissal of the burglary conviction. Petitioner was sentenced to life with mercy for the

first degree murder offense, forty years for the first degree robbery offense, and an indeterminate term of one to five years for the conspiracy offense, with all sentences to run consecutively.  Petitioner was given 495 days jail credit.  *Id.* at 572.

*Petitioner's direct appeal and petition for writ of certiorari*

On appeal, Petitioner challenged the racial composition of his jury venire and the trial court's failure to give a limiting or cautionary instruction concerning Jasman Montgomery's testimony and the effect of his guilty plea.  Petitioner also asserted a violation of the Confrontation Clause of the Sixth Amendment based upon Dr. Kaplan's testimony because he had not performed Matthew's autopsy and did not author the report.  The SCAWV affirmed Petitioner's convictions.  *State v. Flack*, 753 S.E.2d 761 (W. Va. 2013).  Thereafter, Petitioner sought and was denied a writ of certiorari by the Supreme Court of the United States.  *Flack v. West Virginia*, 572 U.S. 1094 (2014).  Petitioner's judgment became final on April 28, 2014 when the Supreme Court denied certiorari.

*Petitioner's first state habeas proceedings*

On January 7, 2014, Petitioner filed a *pro se* petition for a writ of habeas corpus in the Circuit Court of Mercer County.  The circuit court appointed counsel to represent Petitioner and counsel filed a supplemental petition on July 29, 2014.  (ECF No. 13, Ex. 4).  The claims raised before the circuit court were as follows:

1.    The robbery offense was a lesser-included offense to the felony murder offense predicated on burglary and, as such, double jeopardy attached when the two were merged.

2.    Ineffective assistance of counsel based upon the following:

   (a)    Failure to hire an investigator, an expert in forensic pathology, and a firearms expert, and to cross-examine the State's experts;

13

(b) Failure to object to the autopsy evidence being elicited from a different pathologist than the one who performed the autopsy;

(c) Failure to object to the co-defendant testifying in front of the jury in prison attire;

(d) Failure to request a *Caudill* instruction regarding the co-defendant's testimony;

(e) Failure to request a copy of the co-defendant's written plea agreement;

(f) Failure to request a self-defense instruction;

(g) Failure to subpoena certain defense witnesses for trial; and

(h) Failure to object to the medical examiner's testimony as denying him the right of confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004) and *State v. Frazier*, 220 W. Va. 724, 735 S.E.2d 727 (2012).

*Flack v. Ballard*, *supra*, 803 S.E.2d at 543.

On July 31, 2015, the circuit court conducted an omnibus evidentiary hearing at which Petitioner's criminal defense counsel, Derrick Lefler, testified about his initial investigation, the defense's theory presented at trial, and his trial tactics and strategic decisions. Petitioner completed a checklist in accordance with *Losh v. McKenzie*, 277 S.E.2d 606 (W. Va. 1981). The SCAWV summarized Mr. Lefler's testimony as follows:

> At the omnibus hearing, defense counsel Mr. Lefler testified that "we were certainly aware the State intended to proceed on a felony murder theory, and the particulars [of how and by whom Matthew Flack was killed], in all honesty, weren't our focus." Mr. Lefler described Ms. Shorter as "the best witness we had." He reasoned that "the last thing they wanted to do" was discredit her. Mr. Lefler testified that Ms. Shorter confirmed that Petitioner and his accomplices made a lot of noise and did not appear to be concerned with being quiet or approaching the house in a fashion that was undetectable. Additionally, because Ms. Shorter testified that she did not see a door kicked in, the defense sought to use her testimony to establish that Petitioner and his accomplices approached the house in a manner that did not appear to be for evil intent. Moreover, Mr. Lefler stated that had Ms. Shorter not been called by the State during its case-in-chief, he would

have called her as a defense witness.  When Petitioner inquired why Ms. Davis and Ms. Burelson were not subpoenaed to testify, Mr. Lefler explained that although he initially looked for these witnesses when he began investigating the case, he could not locate them.

803 S.E.2d at 546.

At the omnibus hearing, Petitioner also presented the testimony of Larry Dehus, a forensic science, firearms, and ballistics expert, who testified that, based upon the trajectory of Matthew's wounds and Jasman's position, it was improbable that Jasman fired the shot that killed Matthew.  Petitioner also called another expert, Danny Lane, who testified regarding his personal investigation of the case, the types of opinions a firearms expert could have offered at trial, and his opinion about how Matthew was shot.

Lane also testified regarding his interview of Heather Davis, one of the two women who accompanied Petitioner on the night of the crime, who gave him a recorded interview. Davis allegedly stated that, had she been subpoenaed, she would have testified that she did not witness any discussions about a plan to commit a robbery, burglary, or any other crime, and that, prior to going to David Flack's residence, they had gasoline in the car and money to purchase beer (which Petitioner claims would have supported a lack of motive to rob anyone).  She further stated that she and Ms. Burelson stayed at Joe Flack's home, while the men allegedly went to buy beer.  *Id.* at 546.  Ms. Davis did not testify at the omnibus hearing.  Lane stated that Davis's testimony would have been helpful to the defense because it could have discredited Shorter's testimony that she saw two females walking towards the vehicle parked in the alley before it drove away.  (ECF No. 26 at 139).

Concerning what defense counsel could have done to better prepare a defense for trial, Lane opined:

The first, thing is, of course, hiring a private investigator with homicide or criminal investigation experience to review the discovery, crime scene

15

photos, investigative reports, expert reports, and things.  They didn't attempt to engage any services of any experts, either forensically or scientifically to reconstruct the crime scene or angle direction of the gunshots, or contest any of the interview -- the evidence it is. * * * [T]hey didn't contact any of the witnesses, State's witnesses, or they didn't come forward with any other witnesses in their disclosures.

(*Id.* at 141-142).

On August 24, 2015, the circuit court issued an "Order Granting In Part and Denying In Part Petitioner's Writ of Habeas Corpus and Order Correcting Sentence Pursuant to Rule 35(a) of the West Virginia Rules of Criminal Procedure" ("Cir. Ct. Order"). (ECF No. 13, Ex. 6).  The Cir. Ct. Order denied Petitioner's claims of ineffective assistance of counsel, but granted habeas relief on his double jeopardy claim and invalidated his 40-year robbery sentence.  (*Id.*)

Petitioner appealed the denial of his ineffective assistance of counsel and false evidence claims to the SCAWV, and the Respondent cross-appealed the Cir. Ct. Order to the extent that it granted habeas relief on the robbery conviction.  (ECF No. 13, Exs. 7 and 8).  The SCAWV held oral arguments on the matter and, on June 9, 2017, the court issued a decision affirming the denial of Petitioner's ineffective assistance of counsel and false evidence claims, but reversing the lower court's decision on the double jeopardy claim and reinstating Petitioner's robbery conviction and sentence.  803 S.E.2d at 557.

Upon the reinstatement of his robbery conviction and sentence, Petitioner filed a Motion for Reconsideration of Sentence, which was granted to the extent that the circuit court ordered that the 40-year sentence on the robbery conviction would run concurrently with the life with mercy sentence on the first degree murder conviction.  (ECF No. 13, Ex. 10).

## *The instant section 2254 petition*

On November 17, 2017, Petitioner filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, raising the following claims for relief:

1.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution when Petitioner was denied the right to confront witness against him.

2.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution right to effective assistance of counsel prior to and during trial.

3.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution when the prosecution knowingly presented false testimony and evidence at trial.

4.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution when the West Virginia Supreme Court misapplied the felony murder rule.

5.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution when multiple convictions and multiple sentences violated his double jeopardy protections.

6.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution when the trial court failed to give a limiting cautionary instruction to the jury regarding testimony of co-defendant Jasman Montgomery.

7.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution because Petitioner's jury was not drawn from a fair cross section of the community.

8.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution because the Petitioner's trial counsel allowed the State's primary witness to testify in prison garb.

9.  Petitioner's Federal Constitutional Right to Due Process of Law was violated under the United States Constitution because the prosecution improperly bolstered alleged accomplice's credibility and discredited Petitioner's character.

(ECF No. 2).

On June 4, 2018, the undersigned entered an Order directing Respondent to file an answer or other responsive pleading by October 4, 2018.  (ECF No. 6).  However, due to an administrative oversight, Respondent's response was not timely filed.  On October 18, 2018, Respondent, by counsel, filed a Motion to File Answer Out of Time and for Extension of Time (ECF No. 10).  Finding good cause, the undersigned granted that motion on October 23, 2018, and extended the deadlines for Respondent's response to January 4, 2019, and Petitioner's reply to March 4, 2019.  (ECF No. 11).

### *Petitioner's Motion for Summary Judgment*

On October 26, 2018, Petitioner filed an Objection to Respondent's Motion to File Answer Out of Time and for Extension of Time and a Motion for Summary Judgment, essentially seeking a default judgment due to Respondent's failure to file a response by the court's initial deadline.  (ECF No. 12).

### *Respondent's Motion for Summary Judgment*

On January 4, 2019, Respondent filed a Motion for Summary Judgment (ECF No. 13), with numerous exhibits, and a Memorandum of Law (ECF No. 14), asserting that Petitioner is not entitled to any relief on his habeas corpus claims and that Respondent is entitled to judgment as a matter of law on each of his claims.

### *Petitioner's Motion for Stay and Abeyance*

On March 8, 2019, Petitioner filed a Motion for Stay and Abeyance (ECF No. 17), requesting that this federal court stay these proceedings to allow him to return to state court to attempt to exhaust his false evidence claim based upon newly discovered evidence in the form of an affidavit from his co-defendant Jasman Montgomery recanting his guilt. (ECF No. 21, Ex. A).  On May 2, 2019, Petitioner filed a Response to Respondent's Motion

for Summary Judgment (ECF No. 21).  That same date, Respondent filed a Response in Opposition to Petitioner's Motion for Stay or Abeyance (ECF No. 22).

*Petitioner's second state habeas corpus proceedings*

On August 12, 2019, the undersigned's staff contacted the Mercer County Circuit Clerk's Office and determined that, on March 21, 2019, Petitioner filed a second habeas corpus petition in the Circuit Court of Mercer County asserting that he received ineffective assistance of trial counsel, that the State coerced his accomplice, Jasman Montgomery, to testify to false and misleading evidence, and that the State used false evidence to obtain Petitioner's conviction.  Petitioner asserted that those grounds for relief were "newly discovered."

On April 10, 2019, the Circuit Court denied and dismissed Petitioner's second habeas corpus petition on the basis of res judicata.  Specifically, the court found that "Petitioner has raised grounds which were raised in the prior proceeding or which with reasonable diligence could have been known and raised, therefore, the Court CONCLUDES  that all of the claims, as now asserted, are *res judicata* for the purpose of any subsequent hearing.  Further, none of Petitioner's claims fall into the narrow exceptions that can be asserted after the omnibus habeas hearing."  (*See* Court's Ex. A attached hereto).

**ANALYSIS**

## I.    PETITIONER'S MOTION FOR SUMMARY JUDGMENT

As noted above, on October 26, 2018, Petitioner filed an Objection to Respondent's Motion to File Answer Out of Time and for Extension of Time and a Motion for Summary Judgment, essentially seeking a default judgment due to Respondent's failure to file a response by the initial deadline imposed by the court.  (ECF No. 12).  Petitioner's objection

is moot in light of the undersigned's October 23, 2018 Order granting Respondent additional time to file a response to Petitioner's petition.

Turning to Petitioner's Motion for Summary Judgment, the motion states in pertinent part:

> The Respondent, however, failed to file said Answer as Ordered by the Court. Further, the Respondent failed to ask for an extension to file an ANSWER until two (2) weeks **after** its Answer was already untimely – thereby, missing the Court Ordered deadline to file an ANSWER. Now, in order to remedy its failure, the Respondent asks this Court to put the burden of its failure on the Petitioner by requesting an almost three (3) month extension to file its answer. The Petitioner should not have to bear the burden of the Respondent's failure. Furthermore, Petitioner contends that if the shoe were on the other foot and Petitioner missed a Court Ordered deadline and didn't file a motion for an extension until two (2) weeks after said deadline, the Respondent would no doubt be unsympathetic to the Petitioner's position and would be resistant to a three (3) month extension to file out of time.
>
> * * *
>
> Additionally, by failing to Answer Petitioner's 2254 petition as ordered by the Court, the Respondent has not only potentially violated the Petitioner's Constitutional Right to Due Process of Law, but is also attempting to impede and violate the Petitioner's Constitutional Right to the Speedy Administration of Justice. This is unacceptable.

(ECF No. 12 at 4). Petitioner's motion acknowledges that "default" judgments are disfavored in section 2254 proceedings, but he nonetheless requests that the court regard Respondent's failure to respond within the initial deadline as a "tacit concession to the merits of the Petitioner's claims in his 2254 petition . . . ." (*Id.* at 5).

The burden to show that he is in custody in violation of the Constitution is on Petitioner. Habeas relief is not granted simply upon the filing of a petition. Petitioner's Motion for Summary Judgment is tantamount to a request for a default judgment, which is disfavored in such proceedings and exceptionally rare. *See, e.g., Ruiz v. Cady*, 660 F.2d 337, 340 (7th Cir. 1981); *Lind v. Ballard*, No. 2:14-cv-26284, 2016 WL 11483825, at *5

(S.D. W. Va. Apr. 27, 2016), *report and recommendation adopted*, 2016 WL 5346950 (S.D. W. Va. Sept. 23, 2016) (a finding of forfeiture or waiver of a response in a section 2254 proceeding does not automatically entitle the petitioner to habeas relief); *Santillana v. Collins*, No. 5:14-cv-12474, 2015 WL 852328, at *3 (S.D. W. Va. Jan. 14, 2015) (collecting cases supporting proposition that default judgment is improper in habeas corpus proceedings), *report and recommendation adopted by* 2015 WL 852335 (S.D. W. Va. Feb. 26, 2015). Summary judgment in a habeas corpus proceeding is not warranted unless the claimant first establishes "his claim or right to relief by evidence satisfactory to the court[.]" *Bermudez v. Reid*, 733 F.2d 18, 21-22 (2d Cir. 1984). Thus, to obtain summary judgment, a petitioner must demonstrate based upon the merits of the claims that "judgment in his favor is warranted **as a matter of law**." *Santillana,* 2015 WL 852328, at * 3 (emphasis in original).

Even if default judgment were available, it is not appropriate in this proceeding. The undersigned found good cause and extended Respondent's deadline for filing a response to Petitioner's section 2254 petition and Respondent filed a Motion for Summary Judgment within the amended deadline and the matters have been fully briefed. This court may now proceed to consider the merits of Petitioner's claims and the evidence in support thereof. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that a default or summary judgment for Petitioner, based solely on Respondent's failure to initially respond to the petition, is not warranted.

## II.    PETITIONER'S MOTION FOR STAY AND ABEYANCE

On March 8, 2019, Petitioner filed a Motion for Stay and Abeyance (ECF No. 17) asserting that he has newly discovered evidence that needs to be introduced at the circuit court level. In *Rhines v. Weber*, 544 U.S. 269, 276 (2005), the Supreme Court held that

a district court has discretion to stay a petition to allow a petitioner to present his unexhausted claims to the state court "when the district court determines that there is good cause for the petitioner's failure to exhaust his claims first in state court." *Id.*

Petitioner's motion contends that an affidavit executed by his co-defendant, Jasman Montgomery, states "that he was threatened and coerced by the State's attorney, Prosecutor Ash, and forced to testify to falsities against Petitioner." (*Id.* at 1). Petitioner then attached Jasman's affidavit to his Reply brief in support of his arguments concerning his false evidence and prosecutorial misconduct claims. (ECF No. 21, Ex. A). Jasman now alleges that his defense counsel and the prosecutor coerced him to testify falsely. Specifically, his affidavit, which appears to have been executed and notarized on March 13, 2018, states in pertinent part:

> In October 2011, I Jasman Montgomery was told to cooperate with the state of West Virginia by giving a statement and testifying against Brandon Flack. My court appointed Counsel Phillip Scantlebury and David Smith, along with prosecuting attorney Scott Ash informed me that if I wanted to see daylight again then I had better take the plea. They falsely told me that I had killed Matthew Flack and would go to prison for the rest of my life if I didn't cooperate with the state in the conviction of Brandon Flack. I knew I didn't kill Matthew, I shot upward and Matthew was shot downward, but I was young and naïve to the law. They told me that they would find me guilty and that they were going to try this case as if I had carried out a hit for Brandon, which was not the case but I didn't want to spend the rest of my life in prison so I went with it. They convinced me that I was a young enough man and would be on[e] day released as a young man, so long as I take the deal. If I didn't they assured me I would never get out. I want the opportunity to once again be free with my family so I took the deal and cooperated. They coerced me into saying that I killed Matthew in a robbery attempt gone wrong to obtain a felony murder conviction against Brandon. At no time on or prior to January 28, 2011 did myself or anyone other than myself develop a plan to rob anyone, nor did we come to West Virginia with the intent to commit any crime or do any harm to anyone. We never demanded or took any possessions from anyone. The door to Brandon's Uncle's home was never kicked in by anyone. At the time of the alleged crime I was under a lot of stress. My girlfriend was pregnant, I was in a different state away from my family, and I was locked down for 23 hours a day. I blamed Brandon for a lot of the things that I was going through

> because of what they had told me.  Scott Ash found me young and vulnerable and made me testify to the acts of murder, robbery, and conspiracy to receive a life with mercy sentence.  None of which I nor my co-defendants committed.

(ECF No. 21, Ex. A).  Petitioner contends that he will be denied his right to introduce this newly discovered evidence and exhaust his State remedies without a stay being granted. (ECF No. 17 at 2).  Petitioner does not indicate when he became aware of Jasman's recantation.

On May 2, 2019, Respondent filed a Response in Opposition to Petitioner's Motion for Stay and Abeyance (ECF No. 22), asserting that all of the claims set forth in Petitioner's section 2254 petition were fairly presented to the state courts and, thus, are colorably exhausted.  Respondent further argues that Petitioner's request for a stay should be denied because it will unnecessarily delay the proceedings and "frustrate" the objectives of the AEDPA.  (*Id.* at 1-2).  Respondent further asserts that the instant proceeding, with an already pending, exhausted petition, "is not the correct vehicle to raise new claims predicated on purported 'newly discovered' evidence."  (*Id.* at 3).  His opposition brief further states:

> Given Petitioner's expressed intent to return to State court, the issuance of a stay would likely result in a delay of resolution of this case measured in years.  Such a delay would clearly frustrate one of the central purposes of AEDPA, which is the timely resolution of federal postconviction proceedings.  *See Rhines*, 544 U.S. at 277 ("Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings."); *see also Duncan v. Walker*, 533 U.S. 167, 179 (2001) (explaining that AEDPA's limitations period "reduces the potential for delay on the road to finality"); *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences").

(*Id.*)

Respondent contends that the instant matter does not fall into the typical circumstances in which a district court grants a stay, such as where the petitioner files a "protective" federal petition or a mixed petition containing unexhausted claims that could not reasonably be exhausted before the statute of limitations expires. Rather, here, Petitioner filed what appears to be a timely, fully-exhausted petition, but is now attempting to offer "newly discovered" evidence in support of one of his previously exhausted claims, and asserts that he will be denied the opportunity to properly support his claims in this court if he is not permitted a stay of this matter to first address the matter in the state courts. Respondent's opposition brief further states:

> In effect then, Petitioner's request for a stay and abeyance represents an effort to transmute his fully-exhausted petition into a "mixed" one. Allowing such a transformation, however, would stand the purpose of AEDPA on its head. As the Supreme Court in *Rhines* explained, one of "AEDPA's goal[s] [is the] streamlining [of] federal habeas proceedings" by incentivizing petitioners to "exhaust all [their] claims in state court prior to filing [a] federal petition." 544 U.S. at 277. The stay and abeyance procedure – which *Rhines* expressly said "frustrates" that purpose – was only approved by the Supreme Court "[a]s a result of the interplay between AEDPA's 1-year statute of limitations and *Lundy's* dismissal requirement" which meant that some "petitioners who come to federal court with 'mixed' petitioners run the risk of forever losing their opportunity for any federal review of their unexhausted claims." *Rhines*, 544 U.S. at 275.

> Petitioner does not fall within this narrow category; indeed, the plain language of AEDPA provides a pathway for review of a claim predicated on "newly discovered" evidence – a "second or successive" habeas petition. *See* 28 U.S.C. § 2244(b)(2)(B)(i) (permitting a "second or successive" federal habeas petition where "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence"). Assuming Petitioner can satisfy the various procedural strictures and threshold requirements that apply to such a claim – namely that his claim flows from a genuinely "new" factual predicate, which he diligently pursued, and is compelling enough to change the outcome below, *see* 28 U.S.C. § 2244(b)(2), as well as obtaining permission from the relevant United States Court of Appeals, *see* 28 U.S.C. § 2244(b)(3)(A) – he will be able to pursue, in a subsequent federal case, the "new" claim he plans to advance in State court proceedings (assuming of course, the State courts grant no relief). Thus, it is readily apparent that, in the absence of a stay, Petitioner will not

> "*forever* lose" his opportunity for federal review.  As such, allowing him to take advantage of the stay and abeyance procedure (and potentially amend the instant petition should his "newly discovered" evidence claim fail in State court) would amount to little more than an end-run-around the procedural restrictions that apply to "second or successive" petitions.  That, this Court should not facilitate.

(ECF No. 22 at 5-6).

Respondent further contends that denying a stay in this matter will not prejudice Petitioner because the one-year statute of limitations under AEDPA would run from a later date.  Specifically, his opposition brief states:

> Assuming *arguendo*, that Petitioner's "newly discovered evidence" (the affidavit of his co-defendant) is actually "new" – that is, that the facts contained in the affidavit could not have been discovered through the exercise of due diligence until recent weeks or months – then the year-long limitations period with respect to that claim would not begin to run until the factual predicate could have been (recently) discovered  and, as noted above, Petitioner can initiate State court postconviction proceedings advancing that claim, which will trigger AEDPA's tolling provision.  28 U.S.C.A. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.").

(*Id.* at 6).

Respondent acknowledges that Petitioner's claim of "newly discovered evidence" should first be addressed in the state courts, but he further attempts to argue that the claim is meritless.  His opposition brief further states:

> The facts of this case make it very unlikely that an affidavit from Petitioner's co-defendant could contain information sufficient to undermine the confidence of a judicial arbiter as to the fundamental fairness of Petitioner's trial.  Given the underlying theory pursued by the State – felony murder, predicated on burglary – the central question in Petitioner's trial was whether or not Petitioner and his associates arrived at the scene of the crime (a house owned by Petitioner's uncle) with intent to break-in (and likely steal) or whether they arrived for a social call that went horribly awry.

* * *

25

> Given that the State had evidence from a variety of sources upon which it could rely to establish criminal intent – including for instance, the fact that Petitioner or one of his accomplices gained entry to the house by "kick[ing] in" a door [citation omitted] – it is unlikely that any statement or recantation would negate the circumstantial evidence establishing that Petitioner had criminal intent sufficient to sustain a burglary conviction. And, because his felony murder conviction was predicated on the burglary conviction – and it is uncontested that the victim died during the commission of that burglary – Petitioner's "newly discovered" evidence is unlikely to entitle him to postconviction relief. Accordingly, a stay and abeyance is unwarranted – even if Petitioner has established good cause – because the claim he intends to advance is "plainly meritless."

(*Id.* at 7-8).

Petitioner has presented an affidavit from Jasman Montgomery asserting that he was coerced by the prosecutor and his counsel to testify falsely at Petitioner's trial. Petitioner contends that this evidence was not available to him to present in his prior state habeas proceedings. Montgomery's affidavit now contends that there was no plan or agreement between himself and Petitioner, or anyone else, to go to David Flack's house in Bluefield, West Virginia to commit a burglary, robbery, or any other crime. Montgomery further asserts that he did not fire the gunshot that killed Matthew Flack. (ECF No. 21, Ex. A). As noted in the procedural history above, Petitioner filed a second petition for a writ of habeas corpus in the Circuit Court of Mercer County on this basis and it was rejected as being barred by res judicata.

In accordance with *Rhines*, Petitioner must demonstrate good cause for his failure to exhaust his claims related to this issue in the state courts. Additionally, the district court would abuse its discretion if it were to grant a stay when the unexhausted claims are plainly meritless. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). 544 U.S. at 277.

26

Here, the lateness of Jasman's affidavit in relation to Petitioner's and his own criminal and post-conviction proceedings makes its credibility questionable.  Moreover, Petitioner's failure to present the affidavit to this court until almost a year after it was executed undermines a finding that Petitioner acted with due diligence in pursuing his post-conviction remedies in this respect.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated good cause for his failure to exhaust his false evidence claim or related claims in the state court.

Even if Petitioner could demonstrate good cause, as explained in greater detail below, his false evidence claim is plainly meritless.  In Ground Three of his petition, Petitioner contends that he was denied due process because the State presented false evidence through Jasman Montgomery's testimony.  However, to succeed on this claim, Petitioner must demonstrate that there was a reasonable likelihood that such false testimony could have materially affected the jury's verdict.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also United States v. Bagley*, 473 U.S. 667 (1985).

Many of Petitioner's grounds for habeas relief turn on whether a felony murder occurred if Matthew Flack was, in fact, killed by a bullet fired by another innocent occupant of the house, rather than one of Petitioner's accomplices.  Jasman Montgomery's affidavit claims that he did not fire the fatal shot, and prior opinions offered by Petitioner's expert witnesses at his omnibus hearing suggest that the forensic evidence establishes that Jasman could not have killed Matthew.

Nonetheless, as noted by the SCAWV in its Memorandum Decision denying Petitioner's habeas appeal, under West Virginia law, felony murder is not negated under these circumstances.  The SCAWV stated:

> The State correctly contends that while this Court acknowledged in [*State ex rel. Davis v. Fox*, 735 S.E.2d 259 (W. Va. 2012)] that West Virginia's felony murder statute does not "encompass[] every death that occurs in the course of a statutorily-enumerated felony regardless of who causes the death," *Id.* at 688, 735 S.E.2d at 265, nothing in *Davis* suggested that the death of an innocent victim caused by the action of another victim (but linked to the perpetrator through the felonious criminal acts that created the foreseeable risk of harm) would fall outside the scope of the felony murder doctrine.

802 S.E.2d at 578 n.9. Therefore, even if the evidence establishes that Mel Thomas, or someone else other than Petitioner, Jasman Montgomery, or Jacob Thomas, killed Matthew, so long as the State can prove that these accomplices entered the house with an intent to commit an enumerated crime, Matthew's death occurred during the foreseeable risk of harm caused by those felonious acts and the felony murder rule applies.

Therefore, the critical issue with Jasman Montgomery's affidavit is his recantation of his testimony that he, Petitioner, and Jacob Thomas planned to burglarize David's house and rob its occupants. However, there is other sufficient evidence that was put before the jury that supports the finding that Petitioner and his accomplices entered the house with a criminal intent. Specifically, a reasonable jury could find, through the testimony on Amanda Shorter, India Simmons, and Mel Thomas, that Petitioner, Jasman, and Jacob donned ski masks and forced their way into the house with firearms.

Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot demonstrate that there is any reasonable likelihood that Jasman Montgomery's false testimony could have materially affected the judgment of the jury. Therefore, notwithstanding Jasman's alleged newly discovered affidavit, Petitioner's false evidence claim is plainly meritless and can be denied on its merits, despite non-exhaustion. Consequently, the undersigned proposes that the presiding District Judge

**FIND** that Petitioner is not entitled to a stay and abeyance of this federal habeas corpus proceeding and his motion should be denied.

## III.    RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Respondent's Motion for Summary Judgment asserts that Petitioner has not demonstrated that the state courts' decisions concerning the claims he has raised in his section 2254 petition were either contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state courts.  Thus, Respondent contends that Petitioner has not demonstrated that he is in custody in violation of the Constitution, laws, or treaties of the United States and that Respondent is entitled to judgment as a matter of law on each of Petitioner's grounds for relief.  The undersigned will proceed to address the merits of each of Petitioner's claims.

### A.    Ground Four – Misapplication of felony murder rule and Ground Three – Presentation of False Evidence.

The undersigned begins with an analysis of Ground Four of Petitioner's section 2254 petition because the resolution of that claim affects a number of his other grounds for relief.  In Ground Four of his section 2254 petition, Petitioner contends that the felony murder rule was misapplied in his case in violation of his right to due process. Specifically, the petition asserts:

> State chose to present its case to the jury on felony murder theory alleging that the petitioner and co-defendants entered a dwelling without authorization with intent to commit a robbery.  Within a minute or two after the petitioner entered his cousin's home, the unarmed petitioner was shot by the cousin, who was then fatally wounded by a gunshot allegedly fired by the co-defendant, the court's jury charge stated that the petitioner could be convicted of felony murder, burglary and robbery under those facts.

(ECF No. 2 at 9).

Despite Petitioner's assertion of a due process violation, Respondent contends that this claim is merely a challenge to the application of state law that is not cognizable in federal habeas corpus. (ECF No. 14 at 9). Respondent's Memorandum of Law asserts that "a petitioner's talismanic invocation of 'Due Process' does not convert a state-law claim into a federal one." (*Id.* at 10) (citations omitted). The Memorandum further asserts that, "[t]o the extent Ground Four is predicated on the idea that [Petitioner's] conviction of both felony murder and another distinct, non-predicate felony arising out of the same criminal transaction is violative of the federal Constitution's prohibition on double jeopardy, that claim is fully addressed in the response to Count Five, *infra*." (*Id.* at 11 n.4).

However, a review of Petitioner's Reply reveals that this claim is actually grounded in Petitioner's assertion that his conviction for felony murder is not supported by the evidence. Specifically, the Reply suggests that the forensic evidence demonstrates that the State's theory of the case, predicated on Jasman Montgomery's testimony, is inaccurate, and "it is more likely than not that neither Petitioner nor any of his accomplices caused Matthew Flack's death." (ECF No. 21 at 11). The Reply further states:

> At common law, a conviction for felony murder predicated on the offense of robbery requires a showing of a homicide committed by the defendant or by an accomplice in the attempt to commit or in the commission of a robbery. *See Sims*, *162 W. VA. At 223, 248 S.E.2d at 841.* In *Commonwealth v. Batley, 426 Pa. 377, 260 A.2d 793 (1970)*,
>
> > ". . . 'in order to convict for felony-murder, the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking [citing authorities]' and that 'the thing which is imputed to a felon for a killing incidental to his felony is malice and not the act of killing.'
>
> The Respondent states that this is a matter in the discretion of the state courts, and does not rise to constitutional violations of Due Process.

> Petitioner was pursued under the felony murder statu[t]e and this misapplication of the charging statu[t]e by the prosecution, along with trial counsel[']s lack of knowledge, stating all deaths that occur during the commission of one of the enumerated felonies, constitutes first degree murder.

(*Id.* at 11-12).

Petitioner then contends that, in some other jurisdictions, courts have held that, where the homicide is committed by the victim, or someone who was not one who had the intent to commit an enumerated felony, such act may not be imputed to the defendant or his accomplices. *See, e.g., State v. Suit*, 323 A.2d 541, 548-49 (N.J. 1974) (rejecting state's argument that felony-murder statute applies to "any death which occurs without regard to the person whose action causes same.") (Other citations omitted). (*Id.* at 12). The Reply further states:

> Petitioner stresses the point that the felony-murder [statute] in West Virginia does not require proof of malice or intent, is that the underlying felony the murder is predicated on carries the intent or malice[.] [I]f a victim kills another victim[,] there is no transfer of the intent or the malice, therefore felony-murder is left to acts *committed* by the *defendant or one of his accomplices.*
>
> In this case, it is highly probable according to the forensic evidence that the fatal shot came from Mel Thomas who was in Matthew Flack[']s home the night of the alleged event and his position on the second floor being above the victim is consistent with the trajectory of the fatal shot, according to the state's witness, the Chief Medical Examiner.

(*Id.* at 14). Thus, based upon this evidence, Petitioner contends that he cannot be guilty of felony murder and that the trial court misapplied the state statute.

The SCAWV has recognized the following elements of felony murder under West Virginia law:

> "The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one of more of the enumerated felonies; (2) the defendant's participation in such commission or attempt: and (3) the death of the victim as a result of injuries

received during the course of such commission or attempt." *State v. Williams*, 172 W. Va. 295, [310,] 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle*, 357 S.E.2d 219 (1987). However, the court later limited the scope of the felony murder doctrine by determining that it did not apply to a co-defendant where an accomplice commits suicide. *See Davis, supra*, 735 S.E.2d 259 (W. Va. 2012). Petitioner attempts to extend that limitation to the circumstances of this case where, he asserts, the victim was potentially killed by another victim or non-perpetrator of the alleged felony.

However, as addressed above in the analysis of Petitioner's motion for stay and abeyance, when the SCAWV denied Petitioner relief in his habeas appeal, the court found that, where a victim kills another victim in the course of an enumerated felony, such circumstances do not fall outside the scope of the felony murder doctrine. 803 S.E.2d at 548 n.9. The court specifically stated that "*Davis* has not altered the rule articulated in *Mayle* which is applicable to the facts of this case." *Id.* This federal court is bound by the state court's interpretation of its own law. Accordingly, the state court did not "misapply" the statute in such a way as to violate Petitioner's due process rights and Petitioner is not entitled to habeas corpus relief on Ground Four of his section 2254 petition.

Petitioner's allegations in Ground Four carry over to his false evidence claim in Ground Three of the petition, which alleges as follows:

> The primary witness for the prosecution was co-defendant Jasman Montgomery who first denied any knowledge of the shootings in his initial statement to police. Then in the presence of his attorney and prosecuting attorney stated that he was outside the house on the porch when he heard the first gunshot. After the interview Montgomery submitted and failed a polygraph exam. The state then presented him to the jury as a person who "just wants to take responsibility for his actions and tell the truth." The petitioner contends to the contrary that Montgomery had been coerced into taking a plea agreement and telling the story the way the state wanted him to tell it to avoid a life in prison without the possibility of parole. The

prosecuting attorney also had Montgomery testify that he shot Matthew Flack in defense of the petitioner with a Hi-Point 9mm semi-automatic pistol that Montgomery testified he put into the trunk of the car. The problem with that testimony is the Hi-Point pistol which the fatal shot was fired from was observed by the first officer on the scene, patrolman Gibson, who stated that the Hi-Point 9mm pistol which he stated he was "very familiar with" was found lying at the scene of the crime beside victim. Further no one testified and the prosecution did not contend that the petitioner was not armed with a weapon. The petitioner sustained gunshot entry and exit wounds to his wrist and groin. Samples taken from the petitioner were positive for gunshot residue. Montgomery, whom prosecution contended shot victim Matthew Flack, was also tested for gunshot residue and that exam came back negative. Given the obvious material inconsistencies and inaccuracies in the testimony of Amanda Shorter, the neighbor who came forth and gave a statement 18 days after homicide[,] [t]he false testimony that the Hi-Point pistol was seized by law enforcement from the trunk of a car[,] and Jasman Montgomery failing a polygraph test[,] [t]he prosecution certainly knew or had every reason to believe that much of the evidence being used to support its theory was not truthful.

(ECF No. 2 at 8). Petitioner seeks to further support this claim with Jasman Montgomery's affidavit, which recants his testimony that Petitioner and his accomplices planned to enter David Flack's house that night to rob its occupants and that he shot Matthew Flack. (ECF No. 21, Ex. A).

Petitioner's false evidence claim appears to have been raised at the circuit court level through his *Losh* checklist. The circuit court construed the "false evidence" claim as being grounded solely in inconsistencies in witness testimony and denied the claim, finding that witness credibility is within the province of the jury. (ECF No. 13, Ex. 6 at 11, 44). On appeal, the SCAWV also treated the false evidence claim as a challenge based upon the inconsistencies in witness testimony. The court initially found:

Inconsistencies between a witness's trial testimony and their previous statements or between the testimonies of multiple witnesses, do not necessarily demonstrate falsity. * * * Petitioner's claim of false evidence arising from the inconsistent testimony of Ms. Shorter and the proffered testimony of Heather Davis, and the inconsistent testimony concerning the recovery of the Hi-Point pistol, fail because he has not made the requisite

showing of falsity.  To the extent that Petitioner's claims rely solely on inconsistent witness testimony, we therefore find Petitioner's arguments unavailing.

803 S.E.2d at 550-552.  The court also found that the fact that Jasman Montgomery had failed a polygraph test or had a motive to lie were not enough to satisfy Petitioner's burden to show falsity.  *Id.* at 552.

A criminal defendant is denied due process of law if the prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  However, a conviction obtained by the knowing use of perjured testimony will only be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also United States v. Bagley*, 473 U.S. 667 (1985).  (ECF No. 14 at 21-22).  Thus, the false evidence must have had a material effect on the jury's verdict.

As further noted by Respondent, a claim under *Napue* "requires a showing of the falsity and materiality of testimony and the prosecutor's knowledge of its falsity."  *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002).  Such a showing requires a demonstration that the evidence was "actually false" and not "merely misleading."  *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000); *accord Hicks v. Ballard*, No. 08-cv-01365, 2010 WL 6230434 (S.D. W. Va. Nov. 15, 2010), *report and recommendation adopted*, 2011 WL 1043459 (S.D. W. Va. Mar. 18, 2011).  (ECF No. 14 at 22).

As stated in the analysis of Petitioner's motion for stay and abeyance above, other sufficient evidence was put before the jury that supports the finding that Petitioner and his accomplices entered the house with a criminal intent.  Specifically, a reasonable jury could find, through the testimony of Amanda Shorter, India Simmons, and Mel Thomas,

that Petitioner, Jasman Montgomery, and Jacob Thomas donned ski masks and forced their way into the house with firearms.  In light of this other evidence, Petitioner has not demonstrated that Jasman's Montgomery's testimony had a material effect on the jury's verdict.  The SCAWV so found in its opinion denying Petitioner's habeas appeal:

> Even if Petitioner was able to prove that the State knew that Mr. Montgomery's testimony was false, Petitioner still fails to prove that any false testimony had a material effect on the jury's verdict.  Although Mr. Montgomery's testimony was helpful to the State in proving Petitioner's criminal intent, there were numerous other witnesses who testified about the events that occurred on the night of the crime and ample evidence of intent, including ski masks and firearms, presented at trial.  Thus, even if the jury found that Mr. Montgomery was not a credible witness, there was still sufficient evidence to convict Petitioner.

803 S.E.2d at 536.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot demonstrate that there is any reasonable likelihood that Jasman Montgomery's false testimony could have materially affected the judgment of the jury.  Therefore, notwithstanding Jasman's alleged newly discovered affidavit, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions were not contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Grounds Three and Four of Petitioner's section 2254 petition.

### B.    Ground Five - Double jeopardy claim.

In Ground Five of his section 2254 petition, Petitioner relies upon the same factual argument made in Ground Four to assert that, based upon those facts, he could not have been convicted of felony murder, burglary, and robbery.  (ECF No. 2 at 14).  Respondent

construes this claim to be asserting that Petitioner's simultaneous conviction for felony murder, burglary, and robbery, arising from the same criminal occurrence, and the multiple sentences impose therefore, was improper under the Double Jeopardy Clause of the Fifth Amendment.[2]

As noted by Respondent, "The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Brown v. Ohio*, 432 U.S. 161, 164 (1977). The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, or against multiple punishments for the same offense. *Justices of Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 306-07 (1984); see also *State v. Gill*, 416 S.E.2d 253 (W. Va. 1992); *Conner v. Griffith*, 238 S.E.2d 529 (W. Va. 1977). Respondent notes that Petitioner's challenge implicates the last of these protections. (ECF No. 14 at 26). Here, Respondent contends that, "double jeopardy does not preclude the imposition of multiple punishments for multiple crimes that arise during a single factual occurrence." (*Id.*) Respondent's Memorandum further asserts:

> Thus, in the absence of expressed legislative intent to impose multiple punishments, double jeopardy requires the courts to determine if multiple sentences for multiple crimes that arose from a singular factual occurrence represent the imposition of independent punishments for separate and distinct crimes, or a constitutionally impermissible double punishment. *United States v. Dixon*, 509 U.S. 688, 745 (1993) ("Courts enforcing the federal guarantee against multiple punishment . . . must examine the various offenses for which a person is being punished to determine whether, as defined by the legislature, any two or more of them are the same offense").

---

[2] As noted *supra*, and in Respondent's Memorandum of Law, the trial court merged Petitioner's burglary charge with the felony murder, on the basis that the murder occurred during the felony offense of burglary, and that the burglary was being committed to commit a robbery therein. Thus, Petitioner was only sentenced on the felony murder and robbery charges. (ECF No. 14 at 25).

(*Id.* at 27).  Thus, the seminal issue in such a claim is whether the petitioner has been convicted and punished for the "same offense."

The Supreme Court of the United States squarely addressed this issue in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), finding that the test to be applied to determine whether there are multiple offenses is whether each provision requires proof of an additional fact which the other does not."  As further noted by Respondent, West Virginia adheres to the principles in *Blockberger* when evaluating a double jeopardy claim.  *See, e.g. State v. Pancake*, 296 S.E.2d 37, 42 (W. Va. 1982); *State v. Williams*, 395 S.E.2d 251, 266 (W. Va. 1983).  Respondent further contends that the SCAWV "faithfully applied these principles" in consideration of Petitioner's claim in his habeas proceedings.  (*Id.* at 27-28).

Petitioner's Reply asserts that "the conviction of robbery is the source of violation, the fact it was presented before the jury as a predicate offense along with burglary, for felony murder."  (ECF No. 21 at 44).  Thus, he appears to be asserting that <u>both</u> the burglary and robbery charges should have been merged into the felony murder charge.  (*Id.*)  His Reply further states:

> Both the United States Supreme Court and this SCAWV have recognized that double jeopardy can be violated where greater and lesser included offenses are involved.  If proof of the greater offense includes all of the elements of the lesser offense, a conviction for one bars a conviction for the other.  *Harris v. Oklahoma, 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed.2d 1054 (1977)* (conviction of felony-murder precludes conviction of underlying felony) [other citations omitted].  So in this case, Petitioner was charged with burglary and/or robbery and felony murder predicated on the burglary and/or robbery.  Therefore, are the same offense, and bars prosecution for the underlying charges.

(ECF No. 21 at 45).  Relying on the analysis in Justice Ketchum's dissent in his habeas appeal, Petitioner contends that the trial court's instructions to the jury demonstrate that

"both burglary and robbery [which are both enumerated in the list of predicate offenses applicable to felony murder] were placed before the jury in the context of felony-murder. The robbery charge was, thus, treated by the trial court as both an element of felony-murder and as a separate offense, resulting in the additional sentence." (*Id.* at 46). Accordingly, Petitioner contends that double jeopardy principles should not permit his conviction for both felony murder and robbery. (*Id.* at 47).[3]

After the Circuit Court had granted habeas relief concerning Petitioner's robbery conviction and sentence, the SCAWV made the following specific findings on this issue:

> In this case, Petitioner was convicted of the charges of conspiracy, robbery, burglary, and felony murder. It is evident from the record that the underlying felony upon which the felony murder charge was predicated was burglary. Therefore, the habeas court's merger of those two offenses was proper under *Williams*. However, the habeas court's conclusion that Petitioner's robbery conviction violated double jeopardy was erroneous because robbery is not a lesser included offense of burglary or a felony murder predicated on burglary. Each provision requires proof of a fact which the other does not.
>
> * * *
>
> As the State correctly contends, the elements of a felony murder predicated on burglary are the elements of burglary, plus the death of a victim. Accordingly, in proving the elements of felony murder predicated on burglary, the State was required to prove a fact it was not required to prove in establishing the elements of robbery, and thus, robbery is not a lesser included offense of felony murder predicated on burglary. Therefore, double jeopardy does not prohibit the imposition of a punishment for both crimes.

*Flack v. Ballard*, 803 S.E.2d at 555-557.

---

[3] The undersigned notes that there is a page missing from Petitioner's Reply brief. Using the numbers found at the bottom of the pages in the document, it is page 42 thereof. Thus, this court has not been able to review the conclusion to Petitioner argument concerning Ground Five, or the introductory page of his argument addressing Ground Seven concerning the jury venire. (*See* ECF No. 21 at Page 47 and 48 of 57 [using the pagination at the top of the page, which is the CM/ECF pagination])

The undersigned proposes that the presiding District Judge **FIND** that the SCAWV's decision denying Petitioner habeas corpus relief on the basis of an alleged violation of the Double Jeopardy Clause was neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Five of Petitioner's section 2254 petition. The state court's analysis is entirely consistent with the clearly established Supreme Court precedent in *Blockburger*.

### C.    **Ground Six – Failure to give limiting instruction.**

In Ground Six of his section 2254 petition, Petitioner contends that his due process rights were violated when the trial court failed to give a limiting instruction concerning the testimony of his co-defendant, Jasman Montgomery, who had previously pled guilty to the murder charge. Specifically, his petition states:

> Petitioner states that the jury was insufficiently instructed due to the lack of the trial court offering an accomplice instruction. Petitioner's co-defendant, Jasman Montgomery, testified against him. Montgomery had previously accepted a plea offer from the state and the state introduced evidence of the plea offer in its direct examination of Montgomery. It is the petitioner's due process right to have an instruction given to the jury, instructing that evidence of the testifying co-defendant's plea may not be considered as evidence of guilt or innocence, but rather goes solely to the issue of the credibility of the co-defendant as witness neither the defense nor the prosecutor requested such instruction and the court did not give the instruction *sua sponte*.

(ECF No. 2 at 15-16).

Respondent asserts that this claim is simply a claim of alleged error of state criminal law and procedure, which the SCAWV found not to be erroneous. (ECF No. 14 at 11). Respondent's Memorandum of Law further states:

> The failure to give a limiting instruction – especially one which the final arbiter of West Virginia law has specifically said is optional and can be

declined for tactical reasons. [FN 6] – does not implicate the fundamental fairness of a criminal trial when it is absent.

[FN 6 – *See Flack*, 232 W. Va. at 713, 753 S.E.2d at 766 (2013) ("The defendant argues that *Caudill* requires a trial court to, *sua sponte*, give a limiting instruction when an accomplice who has pled guilty testifies to that guilty plea at another defendant's trial. The State responds that to impose such a duty upon the trial court may, in actuality, interfere with a defense strategy on dealing with the accomplice's testimony. The State posits that defense counsel, faced with the difficult task of dealing with the damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony. In such cases, the trial court could be interfering with a defendant's right to develop his own trial strategy. We agree.")]

(ECF No. 14 at 11-12 and n.6). Thus, Respondent asserts that, absent the situation where defense counsel requests the instruction and the trial court fails to give it, there can be no due process violation based upon the failure to give a limiting instruction on accomplice testimony. (*Id.*)

Concerning this claim, Petitioner's Reply contends:

In petitioner's case, co-defendant Montgomery was the state's star witness, which makes this case more than the usual need for cautionary instruction. * * * In petitioner's case, co-defendant Montgomery admitted on more than one occasion that he had testified for self interest "because he was angry with petitioner, and that he was aware that "the first person to take the plea gets the deal," he had to secure his freedom. (*See attached Exhibit A Jasman's Affidavit) (see Trial Tr., Resp. Ex. 1 at 178-79).*

This court has declared that the failure to give a cautionary instruction amounts to plain error, *see also Lee v. United States, 343 U.S. 747* (the use of informers, accessories, accomplices, false friends, or any of the other betrayal which are dirty business may raise serious questions of credibility by cross examination and to have issues submitted to the jury with careful instruction). In other words, the jury needs to be instructed to scrutinize informant testimony more carefully than any other witness, even biased witnesses, because of the potential for perjury born out of self interest.

(*Id.* at 15).  Petitioner further contends that the failure to give a *Caudill* instruction in his case was not intentional because neither defense counsel, nor the trial court, were aware of the case law on this issue.  (*Id.* at 15-16).[4]

The SCAWV addressed this issue in Petitioner's direct appeal to determine if it was plain error and found, as noted above, that "whether the trial court should instruct the jury how the accomplice's testimony could, or could not, be considered is a matter best left to the discretion of defense counsel." *Flack*, 753 S.E.2d at 767.  The federal law cited in the SCAWV's opinion supports a finding that the failure to give such an instruction is not reversible error.  *See United States v. Davis*, 838 F.2d 909 (7th Cir. 1988); *United States v. Ojukwa*, 712 F.2d 1192, 1193-94 (7th Cir. 1983); *United States v. Delucca*, 630 F.2d 294, 299 (5th Cir. 1980).

These cases, which involved federal criminal defendants, recognize the clearly established premise that the fact that a co-defendant pled guilty or was convicted of a crime may not be used as substantive evidence that another co-defendant is also guilty of that crime.  However, it is further clearly established that, where a co-defendant testifies, either the prosecutor or the defendant may elicit evidence of the guilty plea for the jury to consider is assessing the co-defendant's credibility as a witness.  In the instant case, the SCAWV specifically found that "[t]here was no evidence that the prosecutor sought to infer [Petitioner's] guilt by virtue of Montgomery's guilty plea, nor was there evidence of any aggravating circumstances surrounding Montgomery's testimony." 753 S.E.2d at 767.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the failure of the trial court to give a limiting or cautionary instruction concerning Jasman

---

[4] Whether Petitioner's counsel was ineffective for failing to request such an instruction will be addressed *infra* in the section addressing Petitioner's claims of ineffective assistance of counsel.

Montgomery's testimony concerning his guilty plea was not plainly erroneous and did not deny Petitioner a fair trial. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law. Consequently, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground Six of Petitioner's section 2254 petition.

### D.    Ground Seven – Unconstitutional jury venire.

In Ground Seven of his section 2254 petition, Petitioner contends that he was denied due process of law at his trial because his jury was not drawn from a fair cross-section of the community. Specifically, the petition states:

> Petitioner argues that the venire from which his jury was selected was not drawn from a fair cross section of the community. The trial court called five panels of jurors to serve as potential jurors in Petitioner's trial. This constituted every available juror in the circuit for the portion of the term in which Petitioner was tried. Of those jurors on the five panels, three were African American. Of those jurors, one appeared for service on the day of Petitioner's trial and that juror was the first to be excused for cause at the outset. Petitioner claims that given the African American population in Mercer County, West Virginia, the venire from which Petitioner's jury was drawn significantly under-represented the African American population of the county.

(ECF No. 2 at 17-18).

As noted by Respondent, the Sixth Amendment guarantees a trial by "an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Taylor v. Louisiana*, 419 U.S. 522 (1975); *Duren v. Missouri*, 439 U.S. 337 363 (1979). Thus, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 at 538. (ECF No. 14 at 29-30). Respondent further notes, however, that, in *Taylor*, the

Supreme Court emphasized that "we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.  Defendants are not entitled to a jury of any particular composition."  *Id.*

Thus, to demonstrate a violation of this Sixth Amendment right, Petitioner must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  *Duren*, 439 U.S. at 364.  (*Id.* at 30).

Petitioner's Reply asserts that "[t]he jury should be composed of his own race." (ECF No. 21 at 48).  His Reply further states:

> In Petitioner's case there was only one African American in his jury pool and she was relieved after revealing she was related to Petitioner.  Leaving an all white jury.  In no way could this all white jury be construed to be of Petitioner's peers, with no African American on his jury the Petitioner's Sixth Amendment and Constitutional Protection of the laws were violation.

(*Id.*)  His Reply further contends that the Equal Protection Clause of the Fourteenth Amendment requires a jury selected by non-discriminatory criteria.  (*Id.*, citing *Pwers v. Ohio*, 499 U.S. 400 (1991), *Strauder v. West Virginia*, 100 U.S. 303 (1975), and *Batson v. Kentucky*, 476 U.S.79 (1986)).[5]

The SCAWV addressed Petitioner's claim in his direct appeal using these standards and determined that Petitioner has not established that his jury was unfairly composed or unrepresentative of the African American population in Mercer County.  Specifically, the SCAWV found:

---

[5] As further noted above, the introduction to his argument on this claim is missing from Petitioner's Reply.

> The defendant contends that his right to be tried by a jury drawn from a cross-section of his community was violated because there was an insufficient number of African Americans in his jury pool and venire. The defendant asserts that, based on the 2010 Census, the African-American population in Mercer County was 6.1 percent. In contrast to that percentage, the defendant noted that only one person in his jury pool was African American and that she was released after disclosing that she was related to the defendant.

*Flack*, 753 S.E.2d at 767. Based upon state case law that mirrors the *Duren* standard set forth above, the Court further found:

> Reviewing this standard, the first element is clearly established from the record. The defendant is African American and he is alleging that members of his race were systematically excluded from jury service. However, there is *no evidence* in the record to support any findings regarding the second or third elements. Most important, there is no evidence that any under-representation was due to systematic exclusion of African Americans in the jury selection process. We see nothing in the record that would lead this Court to conclude that the jury selection process in Mercer County is constitutionally or statutorily flawed.

*Id.* at 767-768.

The state court's analysis is entirely consistent with the applicable clearly-established Supreme Court precedent. Thus, the undersigned proposes that the presiding District Judge **FIND** that the SCAWV's decision denying Petitioner relief on his Sixth Amendment jury venire claim was neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Seven of Petitioner's section 2254 petition.

### E.    Ground Nine – Prosecutorial misconduct in closing.

In Ground Nine of his section 2254 petition, Petitioner contends that the prosecution engaged in misconduct which bolstered his alleged accomplice's testimony and discredited Petitioner. (ECF No. 2 at 21-22). Specifically, he states:

> During closing arguments prosecution bolstered co-defendant Jasman Montgomery's testimony while comparing Petitioner to an alcoholic.

> Saying Petitioner is "almost like an alcoholic who will not admit they have a drinking problem. If they don't admit it, they will never get any better. They don't have a chance at ever getting better, cured or reformed." Telling the ladies and gentlemen of the jury that I will never be reformed because I failed to admit to the charged crimes. All the while saying Mr. Montgomery had chosen to take the first step and doing what he has to, to rectify what he has done.

(*Id.*)

Respondent first addresses the exhaustion status of this claim and whether it was waived in the state court. Respondent's Memorandum of Law states:

> The [SCAWV], though noting that Petitioner had included the issue in his circuit court habeas petition, did not substantively address his claim. *Ballard*, 239 W. Va. at 582 n.13, 803 S.E.2d at 552 n.13. Explaining that "this argument was never developed in Petitioner's habeas petition below or discussed during the omnibus hearing" and noting the circuit court's summary dispensation of issues which were not explored during the omnibus hearing, *see Cir. Ct. Order* (Resp't Ex. 6 at 44), as well as the State's argument that the issue was not properly briefed on appeal, *see Respondent's Response Brief and Cross Appeal* (Resp't Ex. 8 at 33 n.9), the court held that "the issue was undeveloped and therefore waived." *Ballard*, 239 W. Va. at 582 n.13, 803 S.E.2d at 552 n.13. Nevertheless, to the extent that this Court deems it appropriate to evaluate Petitioner's claim, a review of the record clearly demonstrates that the complained-of comments did not render his trial fundamentally unfair.

(ECF No. 14 at 32).

Based upon the SCAWV's specific statement that this matter was waived in his state habeas appeal, the undersigned believes that it is not properly exhausted for the purpose of this federal habeas corpus proceeding. Nonetheless, this court may deny an otherwise unexhausted claim when it is meritless. *See* 28 U.S.C. § 2254(b)(2). Thus, the undersigned will proceed to address the merits of this claim.

The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined

whether prosecutor's conduct affected fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). "Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), *abrogated on other grounds, Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The Fourth Circuit has established a two-part test for determining when a prosecutor's comments deny a defendant due process. First, the prosecutor's comments must have actually been improper. Second, the prosecutor's comments must have been so prejudicial that the criminal defendant was denied a fair trial. *See United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137 (1995); *see also United States v. Davis*, 63 F. App'x 76 (4th Cir. 2003). Factors to be considered in determining whether improper comments were so damaging to a defendant's trial as to require reversal include: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. *United States v. Marshall*, 1 F.3d 235, 241 (4th Cir. 1993) (internal citations omitted); *see also United States v. Harrison*, 716 F.2d 1050 (4th Cir. 1983).

In determining whether the prosecutor's comments denied the defendant fundamental fairness, the court must examine "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Lawson v. Dixon*, 3 F.3d 742 (4th Cir. 1993), *cert. denied*, 510 U.S. 1171 (1994).

Respondent's Memorandum of Law cites this clearly established case law before turning to a summary of the prosecutor's closing argument in Petitioner's trial concerning Jasman Montgomery's decision to plead guilty. His Memorandum of Law states:

> Halfway through the body of his closing argument, the prosecutor briefly commented on Jasman Montgomery's acceptance of responsibility. *See Trial Tr.* (Resp't Ex. 1 at 376) ("Jasman, I must say, Jasman Montgomery, accepted his responsibility and his punishment, life, no guarantee of ever being paroled. He has stood up and taken the first step back in accepting his responsibility and doing what can rectify what he did.") On rebuttal he addresses the contention that the State had "bought" Jasman's testimony. *Id.* at 408-09. ("Jasman Montgomery [gave testimony consistent with the account of several of the surviving victims]. Well, gosh, that's because the State has bought his testimony. Ladies and gentlemen, he came forward. He told the Judge: 'I am guilty of murder in the first degree.' This was not a loitering conviction. This was not a light touch. This was a man taking responsibility for his behavior and trying to rectify that.") These statements — which Petitioner describes as "improper bolstering" are better characterized as commentary on Jasman's credibility — an invitation for the jury to believe that Jasman was telling the truth. Such statements are entirely proper during closing. [Citations omitted]. * * * That such comments were largely made on rebuttal — in an effort to rehabilitate Jasman's credibility after it was attacked by Petitioner's counsel during closing, *see, e.g., Trial Tr.* (Resp't Ex. 1 at 399-400) — only reinforces their propriety. [Citations omitted].

(ECF No. 14 at 32-33).

Respondent also contends that the prosecutor's comment comparing Petitioner's failure to accept responsibility for his conduct to an alcoholic who will not admit to having a drinking problem does not rise to the level of a constitutional violation. (*Id.* at 34). His Memorandum of Law states:

> At the threshold, it is not clear that such a comment is necessarily improper. Read in context, the prosecutor was commenting on Petitioner's refusal to take responsibility for the events that led to his cousin's death, and his willingness to proffer an "incredible" story instead. *See Trial Tr.* at 376-77. Such commentary is often within the permissible boundaries of closing argument in a criminal case. "So long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused." [*United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000)].

(*Id.* at 34). Nevertheless, Respondent contends that, even if the prosecutor's comment was improper, it did not infect Petitioner's trial with unfairness, so as to deny him due process. He contends that the comment was "undeniably isolated" and, "at worst, only mildly inflammatory" and nowhere near as egregious as the comments in *Wainwright*[6], *supra*, which were upheld by the Supreme Court. (*Id.*)

In his Reply, Petitioner contends that the prosecutor "engaged in improper vouching by expressing his personal belief in petitioner's guilt and the credibility of Jasman Montgomery." (ECF No. 21 at 51). His Reply further states:

> Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis, 170 F.3d 546, 550 (6th Cir. 1999)*; see also, *United States v. Emuegbunam, 268 F.3d 377, 404 (6th Cir. 2001).* Petitioner's claim raises both vouching and bolstering arguments.

(*Id.*) Petitioner further argues that "[g]reat latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." (*Id.*)

---

[6] In *Wainwright*, the prosecution's closing argument "included improper remarks that indicated that petitioner was on a weekend furlough when the crime involved [] occurred; implied that the death penalty would be the only guarantee against a future similar act; referred to petitioner as an 'animal;' and reflected an emotional reaction to the case." 477 U.S. at 168.

In the instant matter, the prosecutor's remarks were made in rebuttal to Petitioner's counsel's closing in which Petitioner's counsel attacked Jasman Montgomery's credibility. Thus, as noted by Respondent, the prosecutor's comments "were an effort to rehabilitate Jasman's credibility" and were a fair response to defense counsel's remarks. In fact, courts have applied what has come to be known as the "invited response" or "invited reply" rule, whereby courts look at the remarks within the context of the entire trial to determine whether the prosecutor's behavior amounted to prejudicial error. *Young, supra*, 470 U.S. at 12.

The undersigned proposes that the presiding District Judge **FIND** that, based upon the clearly-established authority cited herein, Petitioner was not denied a fair trial based upon the prosecutor's comments, and the denial of post-conviction relief by the state courts was neither contrary to, nor an unreasonable application of clearly-established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Accordingly, Respondent is entitled to judgment as a matter of law on Ground Nine of Petitioner's section 2254 petition.

### F.    Ground One - Confrontation clause claim.

In Ground One of his section 2254 petition, Petitioner asserts that the trial court allowed Dr. James Kaplan to testify concerning the findings and conclusions of a forensic medical examination performed by another pathologist. Thus, Petitioner contends that he was denied the opportunity to cross examine the witness who actually performed autopsy. (ECF No. 2 at 5). While Respondent acknowledges that the SCAWV determined that this was an error in violation of the Confrontation Clause of Sixth Amendment, Respondent further contends that the state appellate court further found that such error

was harmless beyond a reasonable doubt and, thus, does not entitled Petitioner to habeas corpus relief.

The Confrontation Clause of the Sixth Amendment, and its companion provision in Article III, Section 14 of the West Virginia Constitution, guarantee a criminal defendant's right to confront and cross-examine the witnesses against him. This right renders testimonial statements by a non-testifying witness inadmissible unless such witness is unavailable and was previously subject to cross-examination by the defendant. *See Crawford v. Washington*, 541 U.S. 36 (2004); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) (finding forensic analyses are testimonial statements governed by the Confrontation Clause).

Respondent further contends that "[t]he SCAWV's application of the 'harmless beyond a reasonable doubt' standard is entirely consistent with federal law. Specifically, Respondent's Memorandum of Law in support of his Motion for Summary Judgment states:

> In *Delaware v. Van Arsdall*, the Supreme Court rejected the idea that any violation of the Confrontation Clause demands automatic reversal of a conviction. 475 U.S. 673, 680 (1986) ("After concluding that the trial judge's ruling [that no Confrontation Clause violation had occurred] was constitutional error, the Delaware Supreme Court rebuffed the State's effort to show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained . . . We find respondent's efforts to defense the automatic reversal rule unconvincing.") (internal citations and quotation marks omitted). The Supreme Court noted that it had applied the "harmless beyond a reasonable doubt standard in other Confrontation Clause challenges, *see id.* (citing (*Harrington v. California*, 395 U.S. 250 (1969) and *Schneble v. Florida*, 405 U.S. 427 (1972)), and stressed that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Id.* at 681. So long as a "reviewing court may confidently say, on the whole record, that the constitutional error was harmless," taking into consideration factors including "the importance of the witness testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise

permitted, and, of course, the overall strength of the prosecution's case," a Confrontation Clause violation does not mandate reversal.  *Id.* at 681, 684.

(ECF No. 14 at 13-14).  Respondent further asserts:

> As noted above, the SCAWV accounted for these factors when reaching its conclusion that Dr. Kaplan's testimony was harmless.  There can be little doubt, in a case where the State was proceeding on a felony murder theory and all parties agreed that Petitioner was *not* armed and did not fire the shots that led to the victim's death, that Dr. Kaplan's testimony was far from central to the State's case.  [Citation omitted].  Indeed, given the testimony of Petitioner's accomplice that he fired the shots that mortally wounded the victim, Dr. Kaplan's testimony did little more than establish for the State that the victim had in fact died from those wounds, which was both technically necessary (providing a murder charge requires proof of *corpus delicti*) but also not contested.  Thus, it is clear that Dr. Kaplan's testimony did not have a significant impact on the central question before the jury – was Petitioner involved in a home invasion that led to his cousin's death, or a tragic, late night misunderstanding.

(*Id.* at 14).  Thus, Respondent contends that it was not objectively unreasonable for the state courts to find that the Confrontation Clause violation that arose from Dr. Kaplan's testimony and the failure to call the person who performed the autopsy was harmless error.  (*Id.* at 15).

Petitioner's Response to Respondent's Motion for Summary Judgment acknowledges that "Dr. Kaplan's testimony merely confirmed that Matthew Flack died as a result of a gunshot wound, and that the death was a homicide."  (ECF No. 21 at 25).  Nonetheless, he contends that he was prejudiced by the admission of the testimony and his counsel's failure to object thereto because it allowed the jury to "believe in 'blind faith' that the report and testimony are authentic."  (*Id.*)  His Response further states:

> As in this case it is clear the prejudice that was presented before the eyes and ears of the jury, when the autopsy report was not entered into evidence, asking them to believe in "blind faith" all is to be true.  Introduction of the state['s] witness who had the position of Chief Medical Examiner testifying to a death caused by a gunshot, testified to the projectile recovered from the body as being a 9mm shot from a Hi-Point pistol (even though the projectile could not be matched forensically to the Hi-Point recovered at the scene (*see*

> *attached Exhibit B State Police Forensic Laboratory report*, with the jury
> under the instruction to the elements of felony-murder, compounded with
> the fact defendant counsel objected, then withdrew his objection, falsely
> projecting to the jury his objection was incorrect, and the state was right,
> with the lack of expert or forensic evidence to contest Dr. Kaplan testimony,
> the jury would have been star struck by the testimony of the state[']s
> witness, Chief Medical Examiner Dr. James Kaplan.

(*Id.* at 25-26).

Petitioner raised this issue in his direct appeal, and the SCAWV found that it was

harmless error because:

> Dr. Kaplan's testimony at the defendant's trial had little probative value and
> mirrored testimony from other witnesses. Montgomery testified and
> *admitted to shooting Matthew Flack*. The defendant did not contest
> Montgomery's testimony that he was the shooter. Dr. Kaplan merely
> confirmed that Matthew Flack died as a result of a gunshot wound, and that
> the death was a homicide. Of critical import is that nothing in Dr. Kaplan's
> testimony implicated the defendant in the homicide, linked him to the
> crimes charged, or made it more likely or less likely that the defendant
> committed the murder of Matthew Flack. [Citation omitted].

*State v. Flack*, 753 S.E.2d at 716.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1992), the Supreme Court determined

that in habeas corpus proceedings, the standard for determining whether trial errors,

including constitutional errors, are harmless, is to determine whether the error "had a

substantial and injurious effect or influence in determining the jury's verdict." (citing

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In *Fry v. Pliler*, 551 U.S. 112, 116

(2007), the court clarified that, in *Brecht*, it "rejected the *Chapman* standard in favor of

the more forgiving standard of review applied to nonconstitutional errors on direct appeal

from federal convictions." The *Fry* Court further stated:

> We hold that in § 2254 proceedings a court must assess the prejudicial
> impact of constitutional error in a state-court criminal trial under the
> "substantial and injurious effect" standard set forth in *Brecht*, 507 U.S. 619,
> 113 S. Ct. 1710, 123 L. Ed.2d 353, whether or not the state appellate court
> recognized the error and reviewed it for harmlessness under the "harmless

beyond a reasonable doubt" standard set forth in *Chapman*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed.2d 705.

*Id.* at 121-122.

In light of the fact that the State did not need to specifically prove who killed Matthew Flack or exactly how he died, so long as he was killed during the commission of an enumerated felony, Dr. Kaplan's testimony was only material to the determination that Matthew's death was a homicide, which was basically undisputed. Thus, the undersigned proposes that the presiding District Judge **FIND** that the alleged Confrontation Clause violation did not have a substantial and injurious effect on the outcome of the proceeding and, thus, was harmless error. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were not contrary to, or an unreasonable application of, clearly established federal law and Respondent is entitled to judgment as a matter of law on the Confrontation Clause claim contained in Ground One of Petitioner's section 2254 petition.

In Ground One, Petitioner also claims that "the trial court permitted a police officer to testify" and "counsel did not object to . . . the police officer's hearsay testimony." To the extent that Petitioner is attempting to raise a due process claim on this basis, he does not assert which police officer and what specific testimony he is challenging and how such testimony denied him a fair trial. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to establish any violation of his due process rights on this basis and Respondent is entitled to judgment as a matter of law on this claim contained in Ground One as well.

### G.    Ineffective assistance of counsel.

In Ground Two of his section 2254 petition, Petitioner asserts that his counsel provided ineffective assistance in a number of ways.  In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the petitioner to show prejudice.  *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  *See Strickland*, 466 U.S. at 693.

In support of Ground Two of his petition, Petitioner states:

At trial appointed counsel made no effort to interview and subpoena two material witnesses who were with petitioner the night of alleged offenses. Despite complexities of this capital case, they failed to retain an expert in any field to challenge the state's forensic evidence.  They spent very little time with petitioner preparing for trial.  Also trial counsel allowed medical

> examiner to testify who[] did not perform autopsy. And did not request a jury instruction on accomplice testimony. Trial counsel also allowed prosecution to present knowingly false evidence. Trial counsel failed to visit scene of alleged crime and failed to request a self defense instruction.

(ECF No. 2 at 6-7).

As noted by Respondent, the SCAWV appropriately applied the *Strickland* standard in denying Petitioner habeas corpus relief on these claims. The undersigned will address the merits of each claim in turn.

### *Failure to interview or subpoena fact witnesses*

Petitioner first claims that his counsel was ineffective because they failed to interview, and call as witnesses at trial, Heather Davis and Ashley Burelson, the two females who traveled with Petitioner and the other men from Pulaski, Virginia, to Bluefield, West Virginia on January 28-29, 2011. Petitioner contends that the testimony of these two witnesses was material to his defense because they would have testified that they were not aware of any plan to commit a crime that night, and would have confirmed that they were not in the vicinity of David Flack's house that night, as suggested by Amanda Shorter. Thus, Petitioner contends that their testimony would have called into doubt the credibility of Shorter and Jasman Montgomery.

Respondent contends that the state courts appropriately found that the determination of what witnesses to call at trial is a matter of trial strategy that is "virtually unchallengeable" with respect to counsel's performance. (ECF No. 14 at 19). Petitioner's Reply contends, however, that "[t]he failure to interview or elicit testimony from a key witness may lead to a finding of deficient performance." (ECF No. 21 at 27, citing *Howard v. Clark*, 608 F.3d 563, 571 (9th Cir. 2010). His Reply further asserts:

> Petitioner's trial counsel after Petitioner asked why those witnesses (Ms. Davis and Ms. Burelson) were not subpoenaed to testify, counsel said he

couldn't find them.  But according to the private investigator retained by habeas counsel, he easily located Ms. Davis, found her to [be] cooperative and conducted a recorded interview of her, finding her testimony to be beneficial to the Petitioner.

* * *

Their testimony would have shown there was no intent to commit any crimes, that there had been no discussion of any conspiracy to commit any crime[,] that they had money to purchase whatever they may need.  The testimony of these two witnesses would have supported the defense[']s approach showing there was no conspiracy, plan, to commit a crime.  This was the alleged defense strategy trial counsel was trying to disprove[] intent.

Their testimony should have been presented to the jury who are the fact finders in this case.  The impact of these statements from Heather Davis and Ashley Burelson at trial would have brought doubt to the jury.  The impact of their statements would have brought serious doubt to the credibility concerning the testimony of Jasman Montgomery, the star witness for the prosecution.  Their testimony would have supported the Petitioner[']s version of the events.

(*Id.* at 28).  Petitioner's Reply further contends that defense counsel had "no reasonable strategy" for failing to investigate and develop this material evidence (even just for impeachment purposes).  He further contends that his defense was unduly prejudiced by this failure because there is a reasonable probability that the outcome of his trial would have been different if counsel had conducted this reasonable investigation and called these witnesses.  (*Id.* at 29).

Concerning this claim, the SCAWV found as follows:

As the habeas court correctly determined, defense counsel's decision not to call the two witnesses was a matter of trial strategy.  According to the record, defense counsel was aware that these two female witnesses were not present during the shooting.  It is clear that defense counsel considered these issues but focused on attacking the burglary charge when the State offered it as the predicate offense for felony-murder and the robbery charge.  Mr. Lefler explained that because he believed that Ms. Shorter was Petitioner's best witness and that her testimony would be very beneficial to Petitioner, he did not want to discredit her at trial.

803 S.E.2d at 547. Accordingly, the SCAWV found that counsel's conduct was objectively reasonable under the circumstances. *Id.*

It is noteworthy that Petitioner did not call either Heather Davis or Ashley Burelson as witnesses in his omnibus hearing or present any direct evidence from them. Moreover, during the omnibus hearing, Petitioner's expert, Danny Lane stated that he generally seeks to interview potential witnesses several times "because every time you interview somebody, they may have something different to say, they may say something totally different than they told the police, or they may recall it a different way." (ECF No. 26 at 129-130). Thus, Lane stated that he would not just take a statement and then call that person as a witness because "you never know what they're going to say when they get on the stand, under oath, to testify in court. Sometimes their testimony is totally different." (*Id.* at 130).

In the instant case, there was other sufficient evidence to support a finding that Petitioner and his accomplices entered the house that night with a plan to commit a felony. Thus, even if the court found that defense counsel's conduct fell below an objective standard of reasonableness by failing to interview and call these two females as witnesses at trial, Petitioner has not demonstrated that such failure materially affected the outcome of his trial. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot satisfy the prejudice prong of the *Strickland* standard. Moreover, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

*Failure to retain expert witnesses and to object to Kaplan testimony*

Petitioner further contends that his trial counsel was ineffective because they failed to retain and call any expert witnesses at trial, including a forensic expert, his own pathologist, or a crime scene reenactment expert to testify about the complicated crime scene and forensic evidence.  Respondent contends that, because the State relied upon a felony murder theory, in which it did not matter specifically how Matthew Flack was killed, expert testimony was not material to the defense.  Respondent further asserts that the state courts agreed with this premise.

Concerning the failure to object to and combat the testimony of the medical examiner, the SCAWV found:

> [Petitioner] argues that defense counsel made no effort to challenge the State's forensic evidence by way of cross-examination, or to object to the state's forensic autopsy evidence that was elicited from the testimony of Dr. Kaplan, who did not perform the autopsy.  Petitioner also claims that counsel's failure to object to Dr. Kaplan's testimony allowed hearsay testimony that denied Petitioner's right of confrontation and was reversible error.

803 S.E.2d at 547.  The undersigned has already addressed the fact that allowing Dr. Kaplan to testify about an autopsy he did not perform was harmless error.  Thus, even if Petitioner could establish that his counsel's conduct in failing to object to Dr. Kaplan's trial testimony fell below an objective standard of reasonableness, he cannot demonstrate the requisite prejudice therefrom.  Nor has Petitioner demonstrated that, under the felony murder theory at issue, there was any need or utility in the defense calling its own pathologist to testify.

Turning to the failure to retain and call any crime scene or forensic expert, the SCAWV found as follows:

Petitioner asserts that if defense counsel had retained a crime scene expert prior to trial, he or she would have presented to the jury expert conclusions that the State's theory of the case and the testimony of co-defendant Jasman Montgomery were not accurate and that it is more likely than not that neither Petitioner nor any of his companions caused Matthew Flack's death. * * * Thus, Petitioner argues defense counsel should have presented a defense that Matthew Flack was accidentally shot by Mel Thomas, who was positioned above him on the stairwell. According to this defense, the fatal shot came from a handgun that was still at the scene when the police arrived and not in the trunk of the car at the hospital. Petitioner asserts that the jury would likely have found reasonable doubt of his guilt and acquitted him if his defense counsel had presented this defense . . . .

The State responds that defense counsel chose to pursue trial strategy designed to attack the felony charges of burglary and robbery in order to attack collaterally the felony murder charge. Accordingly, as defense counsel testified at the omnibus hearing, they believed that the jury would not be receptive to a defense case focused on the identity of the shooter. Defense counsel focused on the theory that Petitioner and his co-defendants were not intending to commit a burglary or a robbery, but rather, were simply going to the Flack Residence to visit with Matthew Flack and the shooting was the product of a tragic late-night misidentification. According to the State, such a strategy did not require expert testimony or the retention of an investigator.

802 S.E.2d at 547-48. The SCAWV concluded that, in light of the State's theory of the case, there was no constitutional demand for an investigator or expert witnesses and that counsel's approach was a strategic decision that is not challengeable under *Strickland*. The undersigned agrees.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

*Allowed State to present false evidence*

Petitioner further contends that his trial counsel allowed the State to present false evidence at his trial. The undersigned has exhaustively addressed Petitioner's false evidence claim above and found that, in light of the State's felony murder theory and the other sufficient evidence to support Petitioner's convictions, Petitioner cannot demonstrate that any allegedly false evidence, including Jasman Montgomery's testimony, could have had a material effect on the jury's verdict.

Consequently, even if Petitioner could demonstrate that his counsel's failure to pursue any objections or arguments concerning the State's presentation of allegedly false evidence at trial fell below an objective standard of reasonableness, he cannot demonstrate the requisite prejudice therefrom. Accordingly, his ineffective assistance of counsel claim on this basis lacks merit. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

*Failure to request limiting instruction*

Petitioner further asserts that his trial counsel provided ineffective assistance because they failed to request a limiting instruction concerning Jasman Montgomery's testimony about his guilty plea. It has already been addressed herein that evidence of a testifying co-defendant's guilty plea may only be considered on the issue of his credibility and may not be considered on the issue of the guilt of the defendant then on trial. It has further been addressed that, under West Virginia law, it is not reversible error for the trial court not to give such a cautionary instruction, absent a request from the defendant.

However, in the present claim, Petitioner asserts that his counsel's failure to request such an instruction and, in fact, counsel's unawareness of the law in this respect, fell below an objective standard of reasonableness.

Even if the district court were to find that counsel's conduct was unreasonable, the state courts specifically found that the State did not attempt to infer that Jasman Montgomery's guilty plea should be considered in support of Petitioner's guilt. 802 S.E.2d at 549-50. Concerning Petitioner's ineffective assistance claim on this basis, the SCAWV found as follows:

> [I]t is evident from the record that defense counsel admitted error in failing to seek a *Caudill* instruction. Defense counsel acknowledged in post-conviction proceedings that they were unaware of this Court's holding in *Caudill*. Thus, for purposes of this proceeding, we find that the first prong of *Strickland* has been satisfied and that defense counsel's performance was deficient under an objective standard of reasonableness. [Citation omitted]. However, the habeas court determined that the second prong of *Strickland* (proof that but for counsel's unprofessional errors, the result of the proceedings would have been different) was not satisfied. We agree.

*Id.* The SCAWV further found, in pertinent part:

> The State contends, and we conclude, that it did not emphasize the fact that Mr. Montgomery had pled guilty in the presentation of its case. Mr. Montgomery provided wide-ranging testimony concerning his personal knowledge of the incident in question. While the State briefly mentioned Mr. Montgomery's incarceration at the beginning of his direct examination because he was wearing a prison jumpsuit, it is evident from the State's line of questioning that its intent was to assist the jury in making its credibility assessment. * * * The only other time the plea agreement was mentioned again was briefly in the prosecutor's closing argument when he noted that "Jasman Montgomery accepted his responsibility and his punishment, life, no guarantee of ever being paroled." Accordingly, it is clear from the record that the State did not elicit testimony about Mr. Montgomery's guilty plea with the intent of relying on that testimony as substantive evidence.

*Id.* at 550. Thus, the SCAWV concluded that defense counsel's failure to request a limiting instruction was not "so prejudicial as to change the outcome of the trial." *Id.*

The undersigned agrees that Petitioner cannot demonstrate the requisite prejudice from his counsel's failure to request a limiting instruction concerning his accomplice's guilty plea. Accordingly, his ineffective assistance of counsel claim on this basis lacks merit. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

<u>*Failure to request self-defense instruction*</u>

Petitioner further contends that his trial counsel was ineffective because they failed to request a "self-defense" instruction, predicated on the defense of another, in light of the fact that it is undisputed that Petitioner was unarmed, and Jasman Montgomery testified that he shot his firearm in response to Petitioner being wounded by the gunfire of someone else (Matthew Flack). Thus, Petitioner contends that the evidence supported a self-defense or technically, defense of another, instruction. Petitioner further contends that, without such an instruction, the jury was told only that the State's burden of proof was limited to proving that Matthew Flack's death occurred during the commission of a burglary or robbery. (ECF No. 21 at 40-41).

However, as the SCAWV, after reviewing its precedent on self-defense in the context of felony murder, found:

> In the case before us, the evidence presented at trial did not support a request for a self-defense instruction. The jury heard testimony that Petitioner and his accomplices, armed with handguns and donning ski masks, kicked in the back door of and entered the Flack Residence, thus demonstrating that Petitioner was the aggressor.

802 S.E.2d at 551.  This federal court is bound by the state highest court's interpretation of its own law.

Based upon the evidence of record and the SCAWV's interpretation of its own legal authority, the undersigned proposes that the presiding District Judge **FIND** that trial counsel's failure to request a self-defense or defense of another instruction was not objectively unreasonable and that Petitioner has not demonstrated the requisite prejudice under *Strickland* in order to establish a Sixth Amendment violation on this basis. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

*General preparation for trial and failure to visit the crime scene*

Petitioner further asserts that his trial counsel provided ineffective assistance because they failed to visit the crime scene and, generally, did not spend sufficient time with him in preparation for trial.  Respondent contends that these claims were not specifically addressed by the SCAWV and are "technically unexhausted." (ECF No. 14 at 18 n.12).  However, if these claims were raised in the state court petitions, but summarily denied by the courts, they are, in fact, exhausted.

The undersigned notes that Petitioner's state habeas corpus petitions did generally assert a lack of investigation and proper preparation for trial.  Nonetheless, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not supported this claim with any evidence that would demonstrate that a different trial preparation strategy would have materially affected the outcome of the proceedings.

Petitioner's claim that counsel failed to visit the crime scene appears to be of no moment in light of the felony murder theory and other available evidence, and he has not established what additional trial preparation was necessary.

Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief based upon alleged ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

For all of these reasons, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground Two of Petitioner's section 2254 petition.

### H.      Ground Eight – Allowing Montgomery to testify in prison garb.

In Ground Eight of his section 2254 petition, Petitioner contends that he was denied due process of law because his trial counsel allowed Jasman Montgomery to testify in his orange prison garb.  (ECF No. 2 at 19).  His petition further states:

> Trial counsel made the decision to allow Jasman Montgomery who was the State's key witness and alleged accomplice to the crimes charged to testify against Petitioner about pleading guilty to first degree murder in prison garb.

(*Id.*)  Petitioner initially raised this claim under the rubric of ineffective assistance of counsel in his circuit court habeas petition, and it appears that it was cursorily addressed by the circuit court.  It further appears that Petitioner did not specifically assert this claim of ineffective assistance of counsel in his habeas appeal.  Thus, the undersigned questions whether this claim is properly exhausted.  Nonetheless, Respondent has addressed the merits of the claim herein.

Respondent contends that this is a state law claim that is not cognizable in federal habeas corpus. (ECF No. 14 at 10-12). Respondent contends that this claim falls outside the Fourteenth Amendment's protection prohibiting the State from requiring a criminal defendant to testify in prison clothing, as addressed in *Estelle v. Williams*, 425 U.S. 501 (1976). In *Estelle*, the Court held that:

> the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, [although] the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation.

*Id.* at 512.

Respondent cites to a decision of the Ninth Circuit addressing the distinction between requiring a criminal defendant from appearing at trial in prison garb versus a witness. *See Saenz v. Marshall*, 990 F.2d 1260 at *1 (9th Cir. 1993) (unpublished table decision) (explaining that "[d]efendants in a criminal trial may not be required to wear prison garb over their objection. To do so would violate the due process right to a fair trial," citing *Estelle v. Williams*, 425 U.S. 501, 503-05 (1976), but further stating that "*Estelle* does not extend to *a witness in prison garb*, and there are no cases in this circuit or other circuits specifically holding that witnesses must also be dressed in street clothing.") (emphasis added). (ECF No. 14 at 11 n.5). Another member of this United States District Court has also recognized the distinction between requiring a criminal defendant to appear at trial in prison attire versus the same for a trial witness and acknowledged the absence of any authority to the contrary. *See Samples v. Ballard*, No. 2:14-cv-15413, 2016 WL 1271508, *11 (S.D.W. Va. Mar. 31, 2016) (Johnston, J.), *aff'd*, 860 F.3d 266 (4th Cir. 2017).

Petitioner has not disputed this applicable authority. Rather, he simply states, in a conclusory manner, that his counsel "denied the right to have the witness testify in street clothes, believing the bright orange prison jumpsuit would be helpful to the petitioner's case." (ECF No. 21 at 21). At the omnibus hearing, Mr. Lefler testified that the decision not to object to Jasman Montgomery appearing in prison attire was a matter of trial strategy. Such tactical decisions are not subject to review under the *Strickland* standard for ineffective assistance of counsel discussed above.

The state court's analysis is entirely consistent with the applicable clearly established Supreme Court precedent. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of clearly-established federal law on this basis and that Respondent is entitled to judgment as a matter of law on Ground Seven of Petitioner's section 2254 petition.

## I.    Cumulative error claim.

At the conclusion of his Reply brief, Petitioner appears to be raising a new claim of cumulative error or prejudice resulting from all other claimed errors. The Reply states:

> Without waiving his contention that each instance, by itself, merits relief, Mr. Flack points out that, in assessing prejudice, this Court must consider all the instances [of] prosecutorial misconduct and ineffective assistance of counsel which the court finds to have been established together.
>
> Petitioner reiterates that the trial counsel's acknowledgement of his lack of knowing the applicable law in this case, the unreasonable lack of effort to investigate claiming that was his strategy/trial tactic, failure to raise, cautionary/limiting instruction, both counsel and the trial court Judge stating they were not familiar with, started a long line of errors, misapplications, unreasonable applications of clearly established laws, have prevented petitioner from a fair and just trial by a jury of his peers who needed to be guided in aspects of the law along with the types of evidence and testimony how to properly use those types of evidence bring a fair and just verdict supported by the facts. Petitioner relies on a fair and just judgment and prays for relief of the constitutional violations that have plagued his case and freedom.

(ECF No. 21 at 53-54).

In *Fisher v. Angeleone*, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error . . . ." Thus, for a cumulative error analysis to apply, the court must first find that there were actual constitutional errors. Petitioner's claim of cumulative error stems from claims which the undersigned believes to be non-errors. To the extent that Petitioner raises cumulative error concerning claims already addressed herein, those claims lack merit.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted in his federal petition, and that the state courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Petitioner's cumulative error claim.

## RECOMMENDATIONS

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Motion for Summary Judgment (ECF No. 12), **DENY** Petitioner's Motion for Stay and Abeyance (ECF No. 17), **GRANT** Respondent's Motion for Summary Judgment (ECF No. 13), and **DENY** Petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 2).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior

United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Faber.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Petitioner, and to transmit it to counsel of record.

<u>August 15, 2019</u>

Dwane L. Tinsley
United States Magistrate Judge